```
 1              UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3          HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

 4

 5   UNITED STATES OF AMERICA,          )
                                        )
 6                      PLAINTIFF,      )
                                        )
 7            vs.                       ) No. CR 15-00595-RGK
                                        )
 8   ANGELO HARPER, JR.,                )
                                        )
 9   _____DEFENDANT._ )

10            REPORTER'S TRANSCRIPT OF COURT TRIAL
                    DAY 1, PAGES 1 TO 94
11                 TUESDAY, JULY 19, 2016
                   LOS ANGELES, CALIFORNIA
12                      9:04 A.M.

13   APPEARANCES:

14   FOR PLAINTIFF:     OFFICE OF THE UNITED STATES ATTORNEY
                        BY:  ANNE CARLEY PALMER
15                           GEORGE E. PENCE, IV
                             THOMAS STOUT
16                           ASSISTANT UNITED STATES ATTORNEYS
                        312 NO. SPRING STREET
17                      LOS ANGELES, CALIFORNIA  90012
                        213.894.0282
18
     FOR DEFENDANT:     FEDERAL PUBLIC DEFENDER'S OFFICE
19                      BY:  RACHEL A. ROSSI and JENNIFER UYEDA
                             DEPUTY FEDERAL PUBLIC DEFENDERS
20                      321 EAST 2ND STREET
                        LOS ANGELES, CALIFORNIA  90012
21                      213.894.4406

22   ALSO PRESENT:      JONATHAN RUIZ, SPECIAL AGENT, DHS

23   _____

          SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR
24        Official Court Reporter, U.S. District Court
              255 East Temple Street, Room 181-F
25           Los Angeles, CA  90012; 213.894.5949
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                         I N D E X

 2

 3    PROCEEDINGS:                                    PAGE:

 4       Government's opening statement                14

 5       Stipulation read into the record              92

 6

 7    GOVERNMENT'S WITNESSES:                          PAGE:

 8    PATRICK McCALL
         DIRECT EXAMINATION BY MS. PALMER              20
 9       CROSS-EXAMINATION BY MS. ROSSI                39
         REDIRECT EXAMINATION BY MS. PALMER            41
10
      OLADELE SALAAM
11       DIRECT EXAMINATION BY MR. PENCE               43

12    JONATHAN RUIZ
         DIRECT EXAMINATION BY MR. PENCE               58
13

14

15    EXHIBITS RECEIVED INTO EVIDENCE                 PAGE:

16    GOVERNMENT'S EXHIBITS 1, 3, 5, 7 and 31           4

17    GOVERNMENT'S EXHIBIT 9                           27

18    GOVERNMENT'S EXHIBIT 10                          24

19    GOVERNMENT'S EXHIBIT 12                          35

20    GOVERNMENT'S EXHIBITS 15 and 16                  49

21    GOVERNMENT'S EXHIBIT 17                          61

22    GOVERNMENT'S EXHIBIT 18                          72

23    GOVERNMENT'S EXHIBIT 19                          64

24    GOVERNMENT'S EXHIBIT 22                          79

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, JULY 19, 2016

 2                          9:04 A.M.

 3                          - - - -

 4

 5          THE CLERK:  Calling calendar item No. 1, case

 6  No. Criminal 15-595-RGK, United States of America versus

 7  Angelo Harper, Jr.

 8      Counsel, please state your appearances.

 9          MS. PALMER:  Good morning, Your Honor.  Carley Palmer

10  and George Pence for the United States, and with us at

11  counsel's table is AUSA Tom Stout and Special Agent Jonathan

12  Ruiz.

13          THE COURT:  Okay.  Thank you, Counsel.

14          MS. ROSSI:  Good morning, Your Honor.  Rachel Rossi

15  and Jennifer Uyeda on behalf of Mr. Angelo Harper, Jr., who is

16  present in custody.

17          THE COURT:  Thank you, Counsel.

18      In this matter there were three counts originally.  The

19  defendant has already pled guilty to two.  Today is the day set

20  for trial for Count 1, which is the advertising count.

21      Are both sides ready to proceed?

22          MS. ROSSI:  Yes, Your Honor.

23          MR. PENCE:  Yes, Your Honor.

24          MS. PALMER:  Yes, Your Honor.  There are a couple

25  housekeeping matters we'd like to take care of before we go
```

```
 1    forward.

 2              THE COURT:  Okay.

 3              MS. PALMER:  Since this is a bench trial, we would

 4    like to request -- we would like to clarify that we don't need

 5    to ask to publish once something has been admitted into

 6    evidence.

 7              THE COURT:  Once it's been admitted into evidence, you

 8    won't have to publish.  Or, excuse me, you won't have to ask to

 9    publish.

10              MS. PALMER:  And the government would like to move in

11    Exhibits 1, 3, 5 and 7, based on our business records notice

12    that we filed earlier with the Court, as well as Exhibit 31.

13              THE COURT:  Okay.  Any objection?

14              MS. ROSSI:  No, Your Honor.

15              THE COURT:  Okay?  Okay.

16         (Received in evidence, Government's Exhibits 1,

17         3, 5, 7 and 31.)

18              THE COURT:  Counsel, wish to proceed?

19              MS. ROSSI:  Your Honor, we do have motions in limine

20    pending.

21              THE COURT:  Yeah, Counsel, I know you do.  You have

22    motions in limine that were filed when this was still a jury

23    trial.  They are evidentiary issues.  I can handle them as they

24    come up.  I don't see what the problem is with a court trial.

25    If there's anything you think you need for a court trial,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   that's fine, let me know; I'll be happy to resolve those right
 2   now.
 3              MS. ROSSI:  Well, Your Honor, we do have a motion
 4   pending to exclude one of the government's witnesses.  If the
 5   Court would prefer to wait until that witness testifies or now.
 6              THE COURT:  Yeah, when the witness testifies.  I mean,
 7   if you want it earlier, that's fine.  I can do it now if you
 8   want, if you want to argue it now, but I can also do it at the
 9   time they call that witness.
10              MS. ROSSI:  We would prefer to do it now, if the
11   Court --
12              THE COURT:  Okay.  There is a -- I believe it was on
13   the expert witness.
14              MS. ROSSI:  Yes, Your Honor.
15              THE COURT:  Okay.  Counsel want to be heard?
16              MR. PENCE:  Yes, Your Honor.
17      The defense argues that the government provided improper
18   notice of the expert witness, and that is simply not the case.
19   On June 29th, the government provided a detailed notice that
20   described exactly who the witness was, what his opinion would
21   be, his qualifications to provide that opinion, and how he
22   would arrive at that opinion.
23              THE COURT:  Counsel, let me ask before we even get
24   started, the testimony of the witness in the motion in limine
25   indicated he's going to be testifying to whether or not these
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  were Photoshopped or whether or not they are accurate images.

2          MR. PENCE:  That's correct, Your Honor.

3          THE COURT:  Is it an issue?  Has anybody questioned

4  it?  Has anybody indicated that they're going to argue that

5  it's not?  Has anybody indicated that they are Photoshopped?

6  If it's not an issue, it's not an issue, and so I don't know

7  why you would be calling the witness.  Now, I don't know if the

8  defense is going to put it into issue or not.  If they are,

9  then I'll be happy to address it.  That's one of the reasons I

10 wanted to wait till the end.  If they don't put it into issue,

11 then their argument would be irrelevant, what he has to

12 testify.  If they do put it into issue, then I'll have to

13 determine that.

14         MR. PENCE:  Your Honor, I agree with your preferred

15 approach, would be to save argument until the witness has

16 actually testified.

17         THE COURT:  You have an indication, or if counsel

18 wants to represent at this time they are putting that into

19 issue, I'll decide it now.  Or we can wait.

20     *(Counsel confer privately.)*

21         MR. PENCE:  Your Honor, there is no stipulation on the

22 table concerning the nature of the images that are -- that the

23 government plans to show.

24         THE COURT:  I just don't know where you're going on

25 it.  The reason I say that, Counsel, is -- well, let me give

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    you an analogy.  You can have an eyewitness identification, and
2    as the government, you don't have to go into proof that there's
3    no twin out there unless they put it into issue.  If there's no
4    evidence there's a twin, then it's not even an issue.  I don't
5    know if that's a good analogy or not.  In this case, if you
6    introduce a photograph, it's presumed to be accurate.  If they
7    attack it, if there's any evidence, then you're going to have
8    to bring in your witness.
9         MR. PENCE:  Your Honor, I believe --
10        MR. STOUT:  Could we have a moment?
11        THE COURT:  Sure.
12    Now, counsel, if either one of you have law saying that
13    that's not true, let me know, but that's my understanding of
14    the law.
15        MR. PENCE:  Your Honor, we do have the burden in this
16    case --
17        THE COURT:  Yeah.
18        MR. PENCE:  -- of establishing that the defendant
19    intended to post -- the advertisement that the defendant posted
20    was for pictures of actual children, real children.
21        THE COURT:  And you'd have the obligation to show that
22    this was the person that was identified, not a twin, also.  I
23    mean, I just don't understand why it's going on.  But I'm going
24    to back off.  You can argue it.  You can argue it.  But it just
25    doesn't seem -- until there's some evidence that this was
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Photoshopped or puts it into issue, I just don't see it being

2  relevant.  Assuming that it is put in issue, go ahead and make

3  your argument.

4            MR. PENCE:  Your Honor, David Jones will provide

5  testimony that the images that he's viewed and which the

6  government intends to offer the Court today do depict what they

7  appear to depict.

8            THE COURT:  I'm assuming he's going to testify to

9  that.  That's what you said in your moving papers.

10           MR. PENCE:  Yes.  And the notice we provided to the

11 defense counsel, which is the basis of their objection to his

12 testimony today, was more than adequate under 16(a)(1)(G).

13 16(a)(1)(G) provides that the government must provide --

14 identify the witness, basis and reasons for the witness and the

15 qualifications to provide that.  Our June 29th notice provided

16 all of that information.

17     What the defense seems to want is a detailed report from

18 our witness that explains all of the factors that went into his

19 determination.  16(a)(1)(G) simply does not require such a

20 report.  At this point, the defense knows exactly the images

21 that are at issue and knows precisely what the defense --

22 Mr. Jones is going to testify about.  Given that that's the

23 case, there's no grounds for excluding his testimony based on

24 deficient notice under 16(a)(1)(G).

25           THE COURT:  Okay.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Counsel.

2         MS. ROSSI:  Yes, Your Honor.

3         The point of the notice requirements in Rule 16 are to

4    give the defense adequate time to prepare cross-examination, to

5    obtain its own expert, and to adequately defend against that

6    expert that the government presents.  And here, yesterday at

7    around noon, the government finally presented some of the basis

8    of the opinions of that expert.  The government previously only

9    provided to defense the conclusions of the expert in a very

10   summary form in a paragraph stating that he would testify that

11   the images are not morphed, composited or digitally altered.

12        The requirements under Rule 16 are for the government to

13   present evidence or to present the summary of why the expert

14   came to that conclusion, and that reason being so that the

15   defense can determine whether it needs to hire its own expert,

16   whether it needs to prepare cross-examination in specific ways.

17        In addition, the Court needs to make a finding as to

18   whether it's proper expert testimony, and the Court cannot do

19   so here.  In --

20        THE COURT:  Counsel, let me just back off.  I don't

21   know why this case is being handled the way it's -- I know you

22   had an objection to it, you'd like to have seen it handled

23   differently.  The Court has an objection to it insofar as it

24   would like it handled differently, but I'm not going to allow

25   this to be turned -- you know, make a mountain out of a

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   molehill on this.
 2        Let me just ask a couple of questions.  When did you
 3   inform him that that was going to be an issue as to whether or
 4   not they were real or not?  Did you inform him?  Because if you
 5   didn't, he doesn't have any obligation.  He could come up at
 6   the last minute, if you put something in issue, and say, "Okay,
 7   I need an expert to refute this."  Was there any indication to
 8   the government prior to this trial that that was going to be an
 9   issue as far as the defense was concerned?
10              MS. ROSSI:  Yes, Your Honor.
11              THE COURT:  When did you give him that information?
12              MS. ROSSI:  Your Honor --
13              THE COURT:  When did he know or should have known that
14   that was going to be an issue?
15              MS. ROSSI:  Well, Your Honor, in about November of
16   last year, the government presented to defense NCMEC reports,
17   which are reports from the National Center for Exploited or
18   Missing Children, which would show whether images contained in
19   the discovery -- in the evidence that the government has
20   retrieved in this case depict actual children, and at that time
21   the government should have known by its own evidence that the
22   images posted in the chat room that are relevant to Counts 1
23   and 2 in this case were not depicting actual children.
24              THE COURT:  Okay.  So one of your objections is that
25   he did not file, or did not serve you in a timely manner with
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    his expert and what the expert was going to be testifying to?

2              MS. ROSSI:  Yes, Your Honor.  And when we did get

3    expert notice, we do have a forensic expert who just analyzes

4    the devices and what's contained on them, and we asked our

5    forensic expert what these conclusions mean, and he wasn't able

6    to give us that answer, so we weren't able to get our own

7    expert to prepare adequate cross-examination.

8              THE COURT:  Okay.

9         Counsel, if you knew in November, why did we wait till

10   right before trial to provide that?

11             MR. PENCE:  Your Honor, the chronology has been

12   oversimplified by defense counsel.  The charges against

13   defendant include advertising, possession and distribution.

14   That's what they were as of a week ago.  In June, before

15   defendant pleaded, the government had been informed by defense

16   counsel of the likelihood of the probability that the defendant

17   would plead.  That would greatly shrink the nature of the case

18   and the number of images that would be shown to the Court in

19   order to prove up the government's case.

20        At the time, the government, out of an abundance of

21   caution, let defense counsel know the identity of the expert

22   that it expected to testify in the event that the substance of

23   these videos and photos, i.e., whether they depicted actual

24   children, would be at issue.  That representation was made --

25   that notice was provided to defense counsel in June.  The plea

1    occurred on July 12, and it was only after the plea occurred

2    that the defense for the first time raised any concern with the

3    notification that the government had provided to the defense in

4    June.

5        The government, as soon as that plea occurred, promptly,

6    promptly had its expert review the images that would be

7    necessary to show at trial, disclosed those images to defense

8    counsel and provided the necessary disclosures that allowed

9    defendant to prepare its case.

10        The November conversation that defense counsel is

11    describing, there's no evidence that I know of of any

12    conversation between defense counsel and the government at that

13    point in time, but even assuming that there was, the mere fact

14    that the government may or may not have known in November that

15    there were real images of children did not require the

16    government to provide notice in November of the actual expert

17    that it would use to --

18            THE COURT:  When would timely notice have been?

19            MR. PENCE:  We provided timely notice.  All that is

20    required is that the defendant have a reasonable -- a

21    reasonable notice and a summary of the expected testimony.  We

22    provided notice almost three weeks before trial of the identity

23    of the expert.

24            THE COURT:  Okay.  Anything else from either side?

25            MR. PENCE:  No, Your Honor.  Thank you.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            MS. ROSSI:  Just to clarify, Your Honor, the identity

 2   of the expert was provided on June 29th.  The images that the

 3   expert actually was opining on, that information was provided

 4   July 14th.  And the analysis or how the expert came to its

 5   conclusions was provided yesterday.  So even had -- we would

 6   not have been able to get an expert in time to analyze the

 7   government's expert's conclusions.

 8            THE COURT:  I thought you said you already went to an

 9   expert and they could not provide you with that information.

10            MS. ROSSI:  Well, we had a different expert,

11   Your Honor, who analyzed just the contents of what was on the

12   devices, and that expert was not an expert in morphing or

13   compositing or digital altering of images.  So our expert that

14   we already have was not able to opine --

15            THE COURT:  So that was an issue that you anticipated

16   might come up, I'm assuming.

17            MS. ROSSI:  Your Honor, it didn't.  It's the

18   government's burden to prove that --

19            THE COURT:  It may not even be an issue in this case.

20   That's what I'm saying, it may not even be an issue.  I'm going

21   to reserve the ruling until that part of the trial where it

22   comes up, okay.

23            MS. ROSSI:  Thank you, Your Honor.

24            MR. PENCE:  Thank you, Your Honor.

25            THE COURT:  And if it comes up at that time and if we
```

1   do allow the expert, counsel, I can tell you right now I'll

2   give you time as far as continuing this case over.  We can do

3   this -- it's a court trial, to -- if you need it, to provide

4   you time to get an expert on it.

5       Okay.  Let's go.  Ready to proceed?  Any other matters you

6   want before?  Motions in limine, anything else, before?

7           MR. PENCE:  No, Your Honor.  The government is ready

8   to proceed.

9           THE COURT:  Go ahead.  Go ahead.

10      Do you care to make an opening statement, Counsel?

11          MR. PENCE:  We do, Your Honor.

12          THE COURT:  Okay.  Go ahead.

13          MR. PENCE:  Your Honor, on October 28th, 2015, the

14  United States charged the defendant with a three-count

15  indictment.  The first and second count in that indictment were

16  for advertising and distribution of child pornography in 2015.

17  The third count of that indictment concerned defendant's

18  possession of child pornography in 2014.

19      As Your Honor just recognized a moment ago, on July 12th,

20  defendant pleaded to the 2015 distribution charge and the 2014

21  possession charge.  So all that is before the Court to decide

22  today is whether the defendant committed the crime of

23  advertising child pornography.

24      The elements of that crime are, one, that the defendant

25  knowingly made, printed, published or caused to be made,

printed or published, an advertisement; two, that the

advertisement offered to receive, exchange, buy, produce,

display, distribute or reproduce any visual depiction if the

production of that visual depiction utilized a minor engaging

in sexually explicit conduct and such visual depiction is of

such conduct; and three, that the defendant knew or had reason

to know the advertisement would be transported across state

lines or mailed, or such advertisement was actually transported

across state lines or mailed.

On August 26, 2015, the defendant visited an existing chat

As the Court will hear today, defendant advertised to

others that he had child pornography to exchange.  He made this

advertisement using an Internet application called Kik

Messenger.  That application hosts online chat rooms.  A chat

room consists of a continuous feed of posts by the members of

that chat room.  Those posts could consist of text messages,

videos or photographs.

On August 26, 2015, the defendant visited an existing chat

room called "#NEPILOVERS."  The home screen for that chat room

made clear that the chat room was about and for child

pornography.  Specifically, the home screen for that chat room

stated, quote, "All the things toddler n nepi," end quote.  The

term "nepi" is simply shorthand for the term "nepiophilia,"

which is a subtype of pedophilia that specifically involves a

sexual attraction to toddlers and infants.

Now, defendant's Kik account was not in his own name.

1   Rather, the defendant used a false name to disguise his

2   identity on Kik.  The false name that he used was Bobby Green.

3       Now, shortly after the defendant entered the chat room, he

4   made the advertisements that are the subject of this case.

5   Specifically, he advertised to the other members of the chat

6   room that he had child pornography to distribute or to trade.

7   Specifically, he stated, and I quote, one, "You guys like

8   toddler boys or girls?  I have pics and vids of both," end

9   quote.

10      He also said, quote, "I have tons of pics and vids of

11  little boys and girls.  PM me for chat and trade of kids under

12  six," end quote.

13      Now, the term "PM" is shorthand for "personal message," or

14  "private message."  Private messages are a feature that the Kik

15  application has that allows its users to communicate privately

16  outside the context of the chat room environment.

17      Defendant, in other words, advertised for the trade or

18  distribution of child pornography within the chat room, which

19  could accommodate up to 50 people, and invited other members of

20  that chat room to then trade, trade photographs or videos of

21  child pornography in private communications that would not be

22  made public to the entire chat room.  Moreover, that day, the

23  defendant posted, alongside these advertisements, sexually

24  explicit photos of children; specifically, infants engaged in

25  sexually explicit acts.

Now, notably, the defendant's plea to distribution of child pornography related precisely to the photos and videos that he posted within the NEPILOVERS chat room.

In October 2015, Special Agent Patrick McCall uncovered Bobby Green's advertisements inside the NEPILOVERS chat room. He investigated those advertisements, and he was able to determine from his office in Delaware that those posts had been made by an IP address located in Moreno Valley, California.

On October 13th, 2015, law enforcement executed a search warrant at that address. Defendant was present when that search warrant was executed. Law enforcement found that day on defendant's person his iPhone, which he used to distribute child pornography on Kik. They also found in defendant's bedroom two HTC mobile phones, which defendant also used for the purpose of distributing child pornography.

That day, law enforcement was able to access defendant's phones because defendant provided law enforcement with the passwords that were necessary to access them, and on those phones, law enforcement found pictures of child pornography and videos of child pornography, and specifically, law enforcement found photographs and video that are visually similar to the photographs that defendant -- and video that defendant posted on Kik.

Now, that day, law enforcement had the opportunity to interview the defendant, and during that interview, the

1  defendant made numerous admissions that are relevant to this

2  case.

3      First, defendant admitted that the Bobby Green account

4  belonged to him.  And not only that, but that he had had that

5  account for at least six months, which means that he had had

6  that account since before the advertisements that are the

7  subject of this trial were posted.

8      Defendant also admitted during that interview that he used

9  the Bobby Green account to distribute child pornography.

10  Defendant admitted that he used his smartphones to upload child

11  pornography to the #NEPILOVERS chat room.  He admitted that his

12  iPhone contained child pornography and that law enforcement

13  should expect to find it there, and he admitted that possessing

14  and -- that he knew that possessing and distributing child

15  pornography is illegal.

16      He also admitted that the child pornography that was on

17  his electronic devices depicted actual children.  Not cartoons,

18  not paintings, not impressionistic stylizations of children,

19  but actual children.

20      And defendant also admitted to having molested his niece,

21  including when she was as young as six months old.

22      Your Honor, the government will present evidence today

23  that clearly meets the elements of advertising child

24  pornography.  Therefore, the United States asks the Court,

25  after reviewing all of this evidence and hearing it here today,

1    to return a guilty verdict.

2        Thank you.

3            THE COURT:  Thank you, Counsel.

4        Counsel, would you care to make an opening statement now,

5    or would you like to reserve it?

6            MS. ROSSI:  We'll reserve it, Your Honor.

7            THE COURT:  Okay.

8        Counsel, you want to call your first witness?

9            MS. PALMER:  Yes, Your Honor.

10       The government calls Special Agent Patrick McCall to the

11   stand.

12           THE CLERK:  Good morning.  Right here to be sworn,

13   please.

14       Do you solemnly swear the testimony that you are about to

15   give in the matter now before the Court shall be the truth, the

16   whole truth, and nothing but the truth, so help you God?

17           THE WITNESS:  I do.

18           THE CLERK:  Thank you.  You may be seated.

19       May I please ask that you state your full name for the

20   record and spell your last name.

21           THE WITNESS:  Patrick Michael McCall, M-c-C-a-l-l.

22           THE COURT:  You may inquire, Counsel.

23           MR. PENCE:  Thank you, Your Honor.

24   ///

25   ///

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

| 1 | **PATRICK MICHAEL McCALL, GOVERNMENT'S WITNESS,** |
|---|---|
| 2 | **DIRECT EXAMINATION** |
| 3 | BY MS. PALMER: |
| 4 | Q.   Good morning, Agent McCall. |
| 5 | A.   Good morning. |
| 6 | Q.   Could you please tell the Court where you work. |
| 7 | A.   I'm a special agent with the Department of Homeland |
| 8 | Security, Homeland Security Investigations, in Wilmington, |
| 9 | Delaware. |
| 10 | Q.   And what does your group do? |
| 11 | A.   I'm primarily responsible for the investigations of cases |
| 12 | involving child exploitation, the distribution of child |
| 13 | pornography, and solicitation of minors online. |
| 14 | Q.   And what is your position within that group? |
| 15 | A.   I'm a special agent. |
| 16 | Q.   And what does that job entail? |
| 17 | A.   The investigation of these crimes on the Internet. |
| 18 | Q.   How did you come to be involved in today's case? |
| 19 | A.   I was conducting an undercover investigation on the Kik |
| 20 | social media application. |
| 21 | Q.   What is Kik? |
| 22 | A.   Kik is essentially a mobile social media application that |
| 23 | allows the users to communicate online and send messages |
| 24 | between both parties.  They can send messages individually or |
| 25 | in a group setting and can transmit videos and images to each |

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    other.

2    Q.    And are those messages, videos and images transmitted

3    through the Internet?

4    A.    They are.

5    Q.    How does a Kik chat room work?

6    A.    Essentially a Kik chat room is created by another -- by

7    essentially a moderator.  The Kik group or chat room can have

8    up to 50 members in the group, and in that group the users can

9    exchange messages, images and videos.

10   Q.    How do you go about your Kik undercover investigations?

11   A.    In this particular instance, we took over the account of a

12   registered sex offender.  He was utilizing Kik to distribute

13   child pornography.  Through this use, we were able to go into

14   rooms that were being utilized for the distribution of child

15   pornography.

16   Q.    Did you ever access a Kik chat room called NEPILOVERS?

17   A.    I did.

18   Q.    How did you come across that chat room?

19   A.    A link to the NEPILOVERS chat group was posted in one of

20   the other chat groups that we were currently in.  So I clicked

21   on the hyperlink that was posted by another user and was

22   granted access to that, to the NEPILOVERS chat group.

23   Q.    And when was that?

24   A.    It would have been sometime after March of 2015.

25   Q.    Were you in the NEPILOVERS chat room in October of 2015?

```
1   A.    I was.

2   Q.    Specifically when in October?

3   A.    In October I was in the NEPILOVERS chat group on October

4   8th and October 12th of 2015.

5   Q.    When you were in NEPILOVERS chat room, did you make any

6   observations about the conduct that you saw there?

7   A.    Yes.

8   Q.    What kind of conduct did you observe?

9   A.    I noticed that the users within the chat group were

10  posting images of child pornography.  They were also posting

11  videos as well.

12  Q.    Was all of this conduct on or after October 8th, 2015?

13  A.    Actually, it was -- the conduct actually went back as far

14  as August 26th of 2015.

15  Q.    How were you able to see the conduct that took place on

16  August 26, 2015?

17  A.    When the poster made -- in the Kik chat group, the posts

18  are chronological in order, so they go from the first post to

19  the last.

20  Q.    When you accessed the NEPILOVERS chat room, what user name

21  did you use?

22  A.    "Likes Them Young."

23  Q.    And why did you choose that user name?

24  A.    Essentially we chose that undercover screen name based on

25  the fact that it was sexually suggestive to having a sexual
```

1    interest in children.

2    Q.    Was there any member of the Nepilover group that caught

3    your interest?

4    A.    Yes.

5    Q.    Who was that?

6    A.    There was a user who had had the display name Bobby Green.

7    Q.    Agent McCall, can you please turn to Exhibit 10 in the

8    binder in front of you.  Do you recognize that exhibit?

9    A.    Yes.

10   Q.    How do you recognize it?

11   A.    Because it has my signature on it.

12   Q.    And what is it?

13   A.    Essentially it's a clip of a video I made from my

14   undercover iPad one of the days that I was in the NEPILOVERS

15   chat group.

16   Q.    When did you take that video?

17   A.    It would have either been on October 8th or October 12th

18   of 2015.

19   Q.    And what does this video show?

20   A.    Video shows the posts by a Kik user, Bobby Green, and the

21   post of child pornography that it was making within the room.

22   Q.    Why did you take that video?

23   A.    The reason I took this video was that the user, Bobby

24   Green, had no avatar associated with his screen name, so when

25   you looked at the actual NEPILOVERS chat group, all you saw was

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  a blank image.  So by making a video, I went through each of

2  his posts and clicked on his avatar, showing that the actual

3  person making the post was the user Bobby Green.

4  Q.   And is the video in Exhibit 10, is that a fair and

5  accurate representation of the video that you took from your

6  iPad?

7  A.   It is.

8  Q.   And is it a fair and accurate representation of what you

9  observed in the NEPILOVERS chat room?

10  A.   It is.

11       MS. PALMER:  Your Honor, at this time I would move

12  Exhibit 10 into evidence.

13       THE COURT:  It will be received.

14     (Received in evidence, Government's Exhibit 10.)

15       MS. ROSSI:  Your Honor, we still have -- some of the

16  contents of that video are subject to our motion in limine to

17  exclude images of child pornography as well as videos.

18       THE COURT:  I understand that is part of it.  Counsel,

19  one of the -- in that motion in limine, one of the things the

20  Court is concerned about, and I'll tell both sides, one, is it

21  relevant; two, is it repetitive, is there a need for it.  Okay.

22       MS. PALMER:  Yes, Your Honor.  Can I take those

23  questions in turn?

24       THE COURT:  I'm sorry?

25       MS. PALMER:  May I take those questions in turn?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                THE COURT:  Yes.
 2                MS. PALMER:  All right.  So, first, it is relevant
 3   because part of the government's burden --
 4                THE COURT:  Oh, I'm not asking for argument on it,
 5   Counsel.  I'm just telling you, I'm not ruling on it at this
 6   time.  She hasn't asked for a ruling on it at this time.  I
 7   don't know what it is, but I'm just telling you one of the
 8   concerns the Court has is inundating or putting a whole lot of
 9   images in when you only need one or two.
10                MS. PALMER:  Understood, Your Honor.
11                THE COURT:  Okay.
12                MS. PALMER:  At this time I would ask Agent Ruiz --
13                THE COURT:  Counsel, if there's something that comes
14   up that you feel is irrelevant, not repetitive, irrelevant, let
15   me know.
16                MS. ROSSI:  Thank you, Your Honor.
17                MS. PALMER:  Agent Ruiz, can you please play Exhibit
18   10.
19        And I'll warn the Court that this does contain child
20   pornography.
21                THE COURT:  Okay.
22        (Video played.)
23                MS. ROSSI:  Your Honor, we would object.  At this
24   point in the video, we believe that the rest of the video is
25   subject to our motion in limine to exclude.
```

1    THE COURT:  Okay.  Counsel, let me, yeah, indicate I

2    think it's getting repetitive now.  This part of the video will

3    come in, which is the first two minutes, I guess, of the video,

4    is admissible.

5    MS. PALMER:  Thank you, Your Honor.

6    Q.   Agent McCall, during that video, we saw various users come

7    in and out of the NEPILOVERS chat room.  What does that mean?

8    A.   Well, as I stated earlier, the chat group has the capacity

9    for 50 individuals, so it's essentially a chronological feed.

10   A user could go into the chat group, post a message, and not

11   necessarily physically remain in the group until he would come

12   back in and see what other messages have been posted.

13   Q.   Can you please turn to Exhibit 9 in the binder in front of

14   you.  Agent McCall, do you recognize that exhibit?

15   A.   Yes.

16   Q.   How?

17   A.   These are screen captures I made of my iPad device on the

18   day that I was in the NEPILOVERS chat group.

19   Q.   And when did you take these screen shots?

20   A.   It would have been on October 8th of 2015 and October 12th

21   of 2015.

22   Q.   Are these screen shots a fair and accurate representation

23   of the images that you took with your iPad and what you saw in

24   the NEPILOVERS chat room?

25   A.   Yes.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1  Q.   Besides the redactions?

 2  A.   Yes.

 3         MS. PALMER:  Your Honor, at this time I would move

 4  Exhibit 9 into evidence.

 5         THE COURT:  Be received.

 6      (Received in evidence, Government's Exhibit 9.)

 7         MS. ROSSI:  Your Honor, and again, the last nine pages

 8  of the exhibit are subject to the motion in limine.  They

 9  correspond with the portion of the video that the Court

10  excluded.

11         THE COURT:  Okay.

12      Okay.  Go ahead, Counsel.

13         MS. PALMER:  Thank you, Your Honor.

14  Q.   Agent McCall, where were you when you took the video that

15  we saw in Exhibit 10?

16  A.   In the state of Delaware.

17  Q.   And where were you when you took the iPad pictures?

18  A.   In the state of Delaware.

19  Q.   When you joined the NEPILOVERS chat room, did you

20  investigate it?

21  A.   Yes.

22  Q.   How?

23  A.   We attempted to identify the user Bobby Green who had

24  posted images and videos of child pornography within that

25  group.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q.   Did you do anything to investigate the NEPILOVERS chat

2    room generally?

3    A.   Not necessarily, no.

4    Q.   Did the NEPILOVERS chat room have a profile?

5    A.   It did.

6    Q.   And did you get any information about that chat room from

7    the profile?

8    A.   Yes.

9    Q.   What information did you get?

10   A.   I went to the actual profile page and made a screen

11   capture of it.  The profile page shows the hash -- the actual

12   name of the chat group as being NEPILOVERS.  The display name

13   states all that they --

14           MS. ROSSI:  Objection, hearsay.

15           THE COURT:  I'm sorry?

16           MS. ROSSI:  Hearsay.

17           MS. PALMER:  Your Honor, if I may.

18           THE COURT:  Yes.

19           MS. PALMER:  It's not hearsay because it's not being

20   submitted for the truth of the matter asserted.  It's going to

21   defendant's knowledge and intent as to what he was advertising

22   when he posted his messages in the NEPILOVERS chat room.

23           THE COURT:  Overruled.

24   BY MS. PALMER:

25   Q.   Agent McCall, you can continue.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    The display name for the -- stated "All the things

2    toddler n nepi."  And above that, there was an avatar which

3    showed pictures of young toddlers and an adult male's penis.

4    Q.    Agent McCall, do you know what "nepi" means?

5    A.    "Nepi" refers to nepiophilia, which is a sexual attraction

6    to infants and toddlers.

7    Q.    You mentioned that you conducted an investigation of Bobby

8    Green.  How did you do that?

9    A.    We served a DHS summons on Kik Messenger for subscriber

10   information relating to that user account.

11   Q.    Did Bobby Green have a profile in the NEPILOVERS chat

12   room?

13   A.    He had a profile, yes.

14   Q.    Did you learn any information from that profile?

15   A.    Just that his display, there was no avatar associated with

16   his screen name and that -- only that his display name was

17   Bobby Green.

18   Q.    Was there an account name as well as the display name?

19   A.    Yes.  His Kik user name was CM8JIAW4.

20   Q.    Does Kik have a time and date stamp feature?

21   A.    Yes.

22   Q.    And the time and date stamps that we see in the video and

23   on the iPad captures, what time zone are those in?

24   A.    Eastern Standard Time.

25   Q.    And why is that?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Because I was accessing them from the state of Delaware,

2    which would have been Eastern Standard Time as well.

3    Q.    Agent McCall, can you please turn to page 3 of Exhibit 9.

4    Did you see posts from Bobby Green on August 26, 2015?

5    A.    I did.

6    Q.    What did you see?

7    A.    The post from October 26 of 2015, essentially there's

8    three to four posts regarding where he states, "Hi, you guys

9    like toddler boys or girls?" question mark.  "I have pics and

10   vids of both," with a wink emoji.

11   Q.    Did Bobby Green post anything else on October 26, 2015?

12   A.    He posted a message, "You guys like toddler boys and

13   girls?" question mark.  "I have pics and vids of both," winking

14   emoji, and then two images of child pornography.

15   Q.    Did he post anything else that day?

16   A.    He finally posted a message, "I have tons of pics and vids

17   of little boys and girls.  PM me for chat and trade of kids

18   under six," with a winking emoji.

19   Q.    You said "PM."  Does Kik have a private messaging feature?

20   A.    Yes.

21   Q.    What does that feature allow?

22   A.    Essentially allows the users to communicate one-on-one

23   between one another.

24   Q.    Did you see Bobby Green post on another day in the

25   NEPILOVERS chat room?

```
 1    A.    Yes.

 2    Q.    What day was that?

 3          MS. ROSSI:  Your Honor, objection again.  This goes to

 4    the motion in limine.

 5          THE COURT:  As to -- I'm sorry, Counsel?

 6          MS. ROSSI:  As to everything posted in October, the

 7    defense has objected on multiple grounds.

 8          MS. PALMER:  Your Honor, may I respond?

 9          THE COURT:  Yes, you may.

10          MS. PALMER:  These are messages and images that are

11    posted by the defendant using the same screen name in the same

12    account.  They're essentially part of the same conversation.

13    As such, they provide important context for the messages that

14    he displayed on August 26th.

15          THE COURT:  I think so.  I'm going to overrule the

16    objection.

17          MS. ROSSI:  Your Honor, is the Court still going to

18    hear the motion in limine?  It's a little more detailed than

19    the argument that --

20          THE COURT:  Counsel, let me help you out.  All the

21    motions in limine at this time I'm denying without prejudice.

22    You can bring them up as they come up in trial.  The only

23    reason I would be sympathetic towards your motions in limine,

24    as I've said before, the only reason I'd be granting the

25    motions in limine on the ones that you've mentioned, it was
```

```
 1   under 403, because it is more prejudicial and probative because
 2   it's already in.  You know, that's the repetitiveness of it.
 3   But so we won't have just objections constantly going as far as
 4   the motions in limine, all motions in limine are denied at this
 5   time subject to you renewing them at the time that you feel
 6   it's proper in the case.
 7              MS. ROSSI:  Understood, Your Honor.  And just to
 8   clarify, it's a separate conversation in October that the
 9   defense is --
10              THE COURT:  I understand that.  And I'm assuming
11   you're -- he's not being charged with this, is what you're
12   saying.
13              MS. ROSSI:  Correct.
14              THE COURT:  He's being charged with the first one.
15        And you're introducing it to show?  Counsel?
16              MS. PALMER:  I'm introducing the messages from October
17   7th and October 13th to show his knowledge as to the -- what he
18   was advertising by placing the messages that he wrote on August
19   26, and this provides context for where he is and what people
20   are looking for there.
21              THE COURT:  For that reason, the Court is overruling
22   the objection.
23              MS. PALMER:  Thank you, Your Honor.
24   Q.   Agent McCall, what was the next day that you saw Bobby
25   Green post in the NEPILOVERS chat room?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   It would have been October 7th of 2015.

2   Q.   And what did he post that day?

3   A.   I believe he posted three images of child pornography and

4   one video.

5   Q.   What was the name of that video?

6   A.   The video was titled "2YO boy toddler baby ram it fucks

7   and swallows dot avi."

8   Q.   Did Bobby Green post any text messages?

9   A.   Yes.

10   Q.   What were those?

11   A.   He posted, "Hello," smile emoji, "I'm liking the name of

12   this group," heart emoji.

13   Q.   Did he post anything else on October 7th?

14   A.   He posted, "You guys like?" question mark.

15   Q.   Did anyone respond?

16   A.   One user responded, "Yeah."

17   Q.   Were there any other days that Bobby Green posted in the

18   NEPILOVERS chat room?

19   A.   Yes.  He posted on October 11th -- I'm sorry.  Yes,

20   October 11th of 2015.

21        THE COURT:  Counsel, the objection now is going to be

22   sustained by the Court as being cumulative and more

23   time-consuming and prejudicial than it is probative.

24        MS. PALMER:  Thank you, Your Honor.  I'll move on.

25   Q.   Agent McCall, can you please turn to Exhibit 12 in the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   binder in front of you.  Do you recognize that exhibit?

2   A.   I do.

3   Q.   How?

4   A.   These are captures of the actual video that was posted on

5   October 11th.  And I've actually watched the video itself.

6   Q.   And are these captures a fair and accurate representation

7   of what you saw in the video that you downloaded from the

8   NEPILOVERS chat room?

9   A.   They are.

10  Q.   Is this the same video that you mentioned earlier?

11  A.   It is.

12  Q.   And are they a fair and accurate representation, with the

13  exception of the fact that these are redacted?

14  A.   Yes.

15       MS. PALMER:  Your Honor, at this time I would move

16  Exhibit 12 into evidence.

17       MS. ROSSI:  Your Honor, if I could, this is the video

18  that Mr. Harper pled guilty two in Count 2.  We're objecting as

19  it being -- as this video being irrelevant and under 403, but

20  specifically, this is a video October 7th that Mr. Harper pled

21  guilty to in Count 2.  It is separate from the August 26th

22  advertising charge.

23       MS. PALMER:  May I respond, Your Honor?

24       THE COURT:  No.  It's overruled.

25       MS. PALMER:  Thank you, Your Honor.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.   Agent McCall, do you want me to repeat the question?

2  A.   Yes, please.

3  Q.   Are the images in Exhibit 12 an accurate representation of

4  what you saw in that video?

5  A.   They are.

6       MS. PALMER:  I would move to admit Exhibit 12 into

7  evidence.

8       THE COURT:  Be received.

9       MS. PALMER:  Thank you, Your Honor.

10      (Received in evidence, Government's Exhibit 12.)

11 BY MS. PALMER:

12 Q.   Agent McCall, can you please turn to Exhibit 1 in the

13 binder in front of you.  Do you recognize that exhibit?

14 A.   I do.

15 Q.   How?

16 A.   This is a copy of a production of records that I received

17 from Kik Messenger pursuant to the summons I served upon them.

18 Q.   Are these true and correct copies of the return that you

19 received from Kik?

20 A.   Yes.

21 Q.   And what did you learn from these documents?

22 A.   The documents provided me information relating to the

23 subscriber account for Bobby Green on the Kik Messenger

24 network.  It essentially told me what his user name and display

25 name were and that he was using an Android phone on the Sprint

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  network to access Kik.

2  Q.   Did those records also tell you an e-mail address that was

3  associated with the Bobby Green account?

4  A.   Yes.

5  Q.   What was that?

6         MS. ROSSI:  Objection, hearsay.

7         THE COURT:  Overruled.

8         THE WITNESS:  Fakesofemail@fakemails.com.

9  BY MS. PALMER:

10  Q.   Could that be fakestofemail@fakermails.com?

11  A.   Yes, I'm sorry, that's correct.

12  Q.   And did that document give you any information about the

13  IP address associated with the Bobby Green account?

14  A.   It did.

15  Q.   What did it tell you?

16  A.   The records show that an IP address of 104.175.141.234 was

17  used to access Kik Messenger.

18  Q.   After receiving this information from Kik, what was the

19  next step of your investigation into Bobby Green?

20  A.   We conducted an investigation of that particular IP

21  address that I just described.  We learned that the IP address

22  was located in the Riverside, California, area.

23  Q.   How did you learn that?

24  A.   Through a website called Maxmind.com.  It's basically a

25  website that allows -- that provides information regarding IP

1    addresses, geo location, and who is actually the host of that

2    IP address.

3    Q.   And what did you learn from Maxmind.com about the IP

4    address associated with the Bobby Green account that was

5    posting in NEPILOVERS?

6    A.   We learned that the IP address was subscribed to Time

7    Warner Cable and was located in the Riverside, California,

8    area.

9    Q.   Can you please turn to Exhibit 5 in the binder in front of

10   you.  Do you recognize that document?

11   A.   I do.

12   Q.   How?

13   A.   This is a copy of the production of records that was

14   provided to me by Time Warner Cable pursuant to the summons I

15   served upon them for that IP address I just described.

16   Q.   And is that a true and correct copy of the return that you

17   received from Time Warner Cable?

18   A.   It is.

19   Q.   And what did you learn from that document?

20   A.   The document showed that this particular IP address was

21   subscribed to an Angelo Harper, the subscriber address is 12959

22   Lasselle Street in Moreno Valley, California, and that the

23   service was currently active since October 5th of 2010.

24   Q.   Did this return from Time Warner Cable tell you about when

25   this account was used?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   Yes.

2    Q.   Did it specifically say it was used at a time associated

3    with any activity you saw in the NEPILOVERS chat room?

4    A.   Yes.

5    Q.   What was that?

6             MS. ROSSI:  Objection, hearsay.

7             THE COURT:  Over- --

8             MS. ROSSI:  It's also not contained in the document,

9    Your Honor.

10             THE COURT:  Sustained.  Sustained.

11   BY MS. PALMER:

12   Q.   You can answer the question, Agent McCall.

13             THE COURT:  No, it's sustained.

14             MS. PALMER:  Oh, it's sustained?

15   Q.   What information did you give Time Warner Cable in order

16   to receive this return?

17   A.   We provided Time Warner Cable with the IP address and a

18   time range when the images were posted to -- images and videos

19   were posted to the NEPILOVERS chat group.

20   Q.   Thank you, Agent McCall.

21             What did you do next in your investigation?

22   A.   We conducted an investigation of Angelo Harper to verify

23   that he was actually the subscriber at this address in Moreno

24   Valley, California.

25   Q.   And what did you do next?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   A.   We learned that Angelo Harper was a registered sex

2   offender, and based on those circumstances, we contacted the

3   HSI office in Riverside, California, for further investigation.

4   Q.   Did you contact any particular individual there?

5   A.   Special Agent Jonathan Ruiz.

6        MS. PALMER:  Your Honor, may I have a moment to confer

7   with co-counsel?

8        THE COURT:  Yes.

9        MS. PALMER:  Thank you.

10       *(Government counsel confer privately.)*

11       MS. PALMER:  No further questions at this time,

12   Your Honor.

13       THE COURT:  Cross-examination.

14                    **CROSS-EXAMINATION**

15   BY MS. ROSSI:

16   Q.   Good morning, Agent McCall.

17   A.   Good morning.

18   Q.   You said that Kik is a mobile messaging device?

19   A.   It's a mobile messaging application.

20   Q.   And does that mean that it is used on mobile devices such

21   as cell phones?

22   A.   Cell phones, tablets, yes.

23   Q.   And you said that the chat groups can contain up to 50

24   people in them?

25   A.   Correct.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  Q.   But that doesn't mean that they always have 50 people

2  total in the chat room.

3  A.   Correct.

4  Q.   And when you enter a Kik chat group, you can see who's in

5  the chat room?

6  A.   You can see who are the other members at that time in

7  that -- for that group.

8  Q.   And you can also see when someone enters the chat room and

9  when they leave the chat room while you're in the chat room,

10  correct?

11  A.   Only if they were to post a message would I see that

12  another person, you know, was physically -- or had physically

13  posted a message to that group.

14  Q.   But you also see when they enter and exit, correct?

15  A.   No.

16  Q.   You don't see in the Kik chat room when a user enters the

17  chat room?

18  A.   Well, a message would have -- would post that

19  such-and-such has left the chat or has entered the chat, yes.

20  Q.   And Agent McCall, you discuss an Angelo Harper who was a

21  registered sex offender.  That was Mr. Harper here's father,

22  correct?

23  A.   Yes.

24  Q.   That was Angelo Harper, Sr.?

25  A.   Correct.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q.   And that was the name of the IP address that you were

2   investigating initially on the subscriber information, correct?

3   A.   Yes, that was a subscribe -- that was the subscriber for

4   that IP address, yes.

5   Q.   During the course of your investigation, you also learned

6   that Kik is a company based in Canada?

7   A.   It is.

8           MS. ROSSI:  May I have a moment, Your Honor?

9           THE COURT:  Yes.

10          MS. ROSSI:  No further questions, Your Honor.

11          THE COURT:  Okay.  Redirect?

12          MS. PALMER:  Brief, Your Honor.

13                    **REDIRECT EXAMINATION**

14   BY MS. PALMER:

15   Q.   Would the subscriber to an Internet service be the person

16   who pays that bill?

17   A.   Not necessarily.

18   Q.   Can members who view a posting -- can members in a Kik

19   chat room view a posting in that chat room even if they aren't

20   physically in the chat room at the time it's posted?

21   A.   You're not -- I'm confused what you mean by "physically in

22   the chat room," chat group.

23   Q.   Can a member of the chat room view something that's posted

24   in the chat room even if they don't have that Kik screen open

25   on their phone at that time that that message is posted?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   Yes, because the messages are chronological in nature, so

2    the earliest message goes to the latest message.

3    Q.   So a member in that chat room could post something that

4    another member could read later; is that correct?

5    A.   Correct.

6    Q.   And on October 8th, 2015, you read the Bobby Green

7    postings from August 26th, 2015, correct?

8    A.   Correct.

9            MS. PALMER:  Thank you.

10           THE COURT:  Any recross?

11           MS. ROSSI:  May I have a moment, Your Honor?

12           THE COURT:  Sure.

13       *(Defendant's counsel confer privately.)*

14           MS. ROSSI:  No questions, Your Honor.

15           THE COURT:  Okay.  You may step down.

16           THE WITNESS:  Thank you.

17           THE COURT:  Next witness.

18           MR. PENCE:  Your Honor, the government calls Oladele

19   Salaam.

20           THE CLERK:  Good morning, Mr. Salaam.  Right here to

21   be sworn.  And you prefer an affirmation?

22           THE WITNESS:  Yes.

23           THE CLERK:  Okay.  Do you affirm under the penalty of

24   perjury that the testimony you are about to give in the cause

25   now before the Court shall be the truth, the whole truth, and

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   nothing but the truth?

2          THE WITNESS:  I do.

3          THE CLERK:  Thank you.  You may be seated.

4      May I please ask that you state and spell your full name

5   for the record.

6          THE WITNESS:  My name is Oladele Salaam.

7   O-l-a-d-e-l-e.  Salaam, S-a-l-a-a-m.

8          THE COURT:  Okay.  You may inquire, Counsel.

9          **OLADELE SALAAM, GOVERNMENT'S WITNESS,**

10                    **DIRECT EXAMINATION**

11  BY MR. PENCE:

12  Q.   Mr. Salaam, what do you do for a living?

13  A.   I'm a special agent with ICE, Homeland Security

14  Investigations.

15  Q.   Do you have any particular responsibilities as an ICE

16  agent?

17  A.   I'm a computer forensics agent.

18  Q.   What is a computer forensics agent?

19  A.   A computer forensics agent is a special agent who has

20  received additional training in basic computer evidentiary copy

21  training.

22  Q.   When did you become a computer forensics agent?

23  A.   I completed my basic training in 2013 April.

24  Q.   What training have you received as a computer forensics

25  agent?

1    A.    In addition to my basic computer evidentiary training,

2    I've also received advanced computer evidentiary copy training,

3    mobile forensics training, training in vendor-specific software

4    like X-Ways, EnCase and FTK.

5    Q.    What computer forensics tools have you been trained to

6    use, if any?

7    A.    EnCase by Guidance Software, FTK by AccessData, Analyze by

8    Griffeye.  I use Cellebrite, UFED, and several others.

9    Q.    How much time have you spent training specifically in the

10   forensic examination of mobile phones?

11   A.    A week total.

12   Q.    And how much time in total have you spent training in the

13   forensic examination of electronic devices?

14   A.    14 weeks.

15   Q.    Have you performed a forensic examination of an iPhone?

16   A.    Yes, I have.

17   Q.    How many times?

18   A.    At least 20 times.

19   Q.    And have you ever performed a forensic examination of a

20   micro SD card?

21   A.    Yes, I have.

22   Q.    And how many times have you done that?

23   A.    At least 20 times.

24   Q.    How many forensic examinations in total have you

25   performed?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A.    I've performed more than a hundred examinations.

 2              MR. PENCE:  Your Honor, the government offers Special

 3    Agent Salaam as an expert in the area of computer forensics.

 4              THE COURT:  Okay.

 5    BY MR. PENCE:

 6    Q.    Are you aware that on October 13, 2015, law enforcement

 7    executed a search and seizure warrant for 12959 Lasselle Street

 8    in Moreno Valley, California?

 9    A.    Yes, I am.

10    Q.    Were you a member of the law enforcement team that

11    executed that warrant?

12    A.    Yes.  I participated in the search warrant.

13    Q.    Do you recognize anyone in this courtroom who was present

14    during the execution of that search warrant?

15    A.    Yes, I do.

16    Q.    Who do you recognize that was present during the execution

17    of that search warrant?

18    A.    To my right, counsel's side, I see Special Agent Jonathan

19    Ruiz, was the lead agent for the search warrant.

20    Q.    Would you please describe Special Agent Ruiz.  Just name

21    an article of clothing that he might be wearing or a

22    characteristic feature.

23    A.    A gentleman that's bearded and wearing a suit and a white

24    shirt.

25              THE COURT:  Okay.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MR. PENCE:  May the record reflect that the witness
 2   has identified Special Agent Ruiz?
 3              THE COURT:  I don't know if it's an issue, Counsel.
 4   He hasn't --
 5              MR. PENCE:  No, Your Honor.  It's true.  Let me move
 6   on.
 7   Q.   Do you recognize anyone else who was present during the
 8   search warrant?
 9   A.   Yes, I do.
10   Q.   Who else do you recognize?
11   A.   The gentleman in white clothing to the -- to my left.
12              THE COURT:  Indicating the defendant.
13              MR. PENCE:  Thank you, Your Honor.
14   Q.   What was your role in the execution of the search warrant?
15   A.   I had two principal roles.  I was part of the surveillance
16   team that sat on the house prior to the arrival of the
17   defendant, but my primary role for the day was the -- for
18   digital devices that were anticipated to be seized at the
19   location for the day.
20   Q.   Did you enter the home that day?
21   A.   I did.
22   Q.   What did you do immediately before entering the home?
23   A.   Before entering the home, I did see the defendant.  I was
24   with him when he presented a phone.  Then I also did a
25   walk-through of the home itself prior to doing any examination.
```

```
1   Q.   What do you mean when you say the defendant presented a

2   phone?

3   A.   Oh.  While I was outside the home, a car did arrive at the

4   house.  When it pulled into the driveway, the gentleman and an

5   individual later identified as his mother came out of the

6   vehicle.  And the team that was waiting did approach them, and

7   when he was patted down, they took a phone out of his pocket.

8   That was when I was with him, I first encountered him.

9   Q.   Was that phone seized at that time?

10  A.   Yes.

11  Q.   What kind of phone was it?

12  A.   It was an Apple iPhone.

13  Q.   What did you do immediately after entering the home?

14  A.   Immediately after entering the home, I walked through the

15  home.  I was looking -- based on the search warrant, it

16  indicated that mobile devices were involved in the crime

17  alleged.  So, typically when I go into homes for search

18  warrants, I look around for things that are immediately obvious

19  to me that were as pointed out in the search warrant.  So I was

20  looking for mobile phones.

21  Q.   Did you follow that particular procedure on October 13,

22  2015?

23  A.   I did.

24  Q.   Were any electronic devices seized that day from

25  defendant's home?
```

1  A.   Yes.

2  Q.   What electronic devices were seized?

3  A.   We seized some mobile phones, computers, and some external

4  storage devices.

5  Q.   Did you seize a Evo Shift mobile phone?

6  A.   Yes, we did.

7  Q.   Do you know where that Evo Shift phone was found?

8  A.   The Evo Shift was found -- when I entered the home, there

9  was a room.  As soon as I went in, went to the right, there's a

10  room with a placard on it that says "AJ Room" -- "AJ's Room."

11  There was the Evo Shift on the couch in that room.

12  Q.   Mr. Salaam, would you please take a look at Government's

13  Exhibits 15 and 16.  They should be in the Redwell that is near

14  you.

15       THE CLERK:  I'll pull those for you.

16       THE WITNESS:  Okay.

17       MR. PENCE:  Your Honor, I believe the courtroom

18  deputy's going to provide the Redwell for you in a moment.

19       THE COURT:  Okay.

20       THE WITNESS:  Thank you.  Okay.

21  BY MR. PENCE:

22  Q.   Do you recognize Exhibits 15 and 16?

23  A.   Yes, I do.

24  Q.   How do you recognize those exhibits?

25  A.   15 is the iPhone that was recovered from the person of

1  the defendant, and 16 is the HTC phone that I referred to

2  earlier that I saw on the couch in the room labeled "AJ's

3  Room."

4          MR. PENCE:  Your Honor, government moves to admit

5  Exhibits 15 and 16.

6          THE COURT:  Be received.

7      *(Received in evidence, Government's Exhibits 15 and 16.)*

8          MS. ROSSI:  Your Honor, the defense, just for the

9  record, preserves its motion to suppress on these two phones

10  that were seized.

11          THE COURT:  And that will be noted for the record,

12  Counsel.  Thank you.

13          MS. ROSSI:  Thank you, Your Honor.

14  BY MR. PENCE:

15  Q.   Was there any on-site inspection of Exhibits 15 and 16

16  conducted that day?

17  A.   Yes.

18  Q.   Who performed that inspection?

19  A.   I did.

20  Q.   What was the purpose of that inspection?

21  A.   Because they are mobile phones, the priority inspection is

22  to make sure I take them offline.  Mobile devices, they keep

23  receiving signal, and since the goal is to preserve evidence,

24  we try to take them offline right away and then do -- once they

25  are offline, I do a preliminary review of the device.

1    Q.   Were the phones locked when you first received them?

2    A.   Yes.

3    Q.   Were you ever -- were you able to unlock those phones?

4    A.   Yes, I was.

5    Q.   Did you obtain the password from those -- for those

6    phones?

7    A.   I did.

8    Q.   And from whom did you obtain the password for those

9    phones?

10   A.   Special Agent Jonathan Ruiz.

11   Q.   Was the Kik Messenger application open on either of those

12   phones after you were able to input the password?

13   A.   When I opened the HTC phone, it opened to a Kik

14   application, but not the iPhone.

15   Q.   And was there any specific account that was locked in --

16   logged in on that Kik Messenger application?

17   A.   No.  It was just open to the login screen.

18   Q.   What did you do with the electronic devices after you

19   seized them?

20   A.   Once I identified the device we needed to seize, I

21   presented it to the recording agent for recording.

22   Q.   Did the recording agent return those devices to you?

23   A.   Yes.

24   Q.   And after the devices were returned to you, what did you

25   do with them?

1    A.    I took them to my lab and did my examination.

2    Q.    After you returned to the lab, how long did you maintain

3    custody of the Evo Shift and the iPhone?

4    A.    I had them for about a week.

5    Q.    Did you conduct a forensic examination of the contents of

6    the iPhone and the Evo Shift?

7    A.    I did.

8    Q.    Who asked you to perform that examination, those

9    examinations?

10   A.    Special Agent Jonathan Ruiz, pursuant to a federal search

11   warrant which I had prior.

12   Q.    Did you prepare a written report of your examinations?

13   A.    I did.

14   Q.    What was the purpose of those examinations?

15   A.    Guided by the search warrant, the purpose is to find

16   evidence or -- either inclusive or exculpatory in nature

17   highlighted in the warrant, and present them to Special Agent

18   Ruiz for review.

19   Q.    How did you go about analyzing the Evo Shift phone in

20   particular?

21   A.    So the -- typically, mobile phones, the goal is to try to

22   get the forensic copy of the entire device.  Now, different

23   brands and the operating system on each one is different, so it

24   presents different difficulties.  So my initial attempt was to

25   get a copy of the entire phone as it was.  But I wasn't able to

1  do that.  When I looked at the device, I found out that it also

2  includes a separate micro SD device, which is an external

3  removable storage.  So since I couldn't get the whole device

4  right away, I copied the storage device by itself and processed

5  that right away because time constraint.

6  Q.   Did you have any difficulty extracting the data that was

7  on that micro SD card?

8  A.   No, I did not.

9  Q.   How did you go about analyzing the iPhone?

10  A.   Same process.  I tried to get a copy of the entire device.

11  IPhone's actually unique in that later versions of the

12  operating system, it's harder to get a complete copy of

13  everything on the device because of the features that the

14  manufacturer placed in, but I was able to get what's considered

15  a logical copy of the phone to see what I could give to the

16  agent for review.

17  Q.   What is a logical copy of the phone?

18  A.   So, to describe a logical copy, I have to -- so, typically

19  in doing the examination, I either do a physical copy or a

20  logical copy.  The way I'll describe the difference between the

21  two, a logical copy of a device is essentially you're relying

22  on the device to provide you the information.  So it's like

23  meeting a stranger that you never know and saying, "Hi, what

24  time is it?" and they tell you the time.  No issue with that.

25  And if you go too personal and say, "What is your name?  What

```
 1   is your husband's name?" depending on that person's
 2   disposition, they may decide what they want to give to you.
 3   Compare that to someone else that's -- so when you are asked
 4   for the information from the device and it gives it to you
 5   willingly, that information is considered a logical copy, which
 6   means there's some things the device will give to me and some
 7   information it will not give to me.  And that varies from
 8   device to device and operating system to operating system.
 9        A physical is when I can get everything on my own without
10   asking the device at all, which is the preferred option.  For
11   the iPhone, logical was the only option I had.
12   Q.   Did you provide a copy of the extracted data from the
13   iPhone and the Evo Shift to anyone?
14   A.   Yes, I did.
15   Q.   Who did you provide that extracted data to?
16   A.   I provided them to Special Agent Ruiz principally for
17   review.
18   Q.   Are you aware of whether Mr. Ruiz reviewed that material?
19   A.   Yes.  He did.
20   Q.   Did Mr. Ruiz provide you any information about that
21   material after you provided it to him?
22   A.   Well, after he reviewed what I presented to him, he told
23   me he found --
24            MS. ROSSI:  Objection, hearsay.
25            THE COURT:  Sustained.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. PENCE:

 2   Q.   Did you receive any information from Mr. Ruiz about that

 3   data after you provided it to him?

 4           MS. ROSSI:  Same objection.

 5           THE COURT:  Premature.  Overruled at this time.

 6        Did you receive any information?

 7           THE WITNESS:  Yes, I did.

 8           THE COURT:  Okay.  Next question.

 9   BY MR. PENCE:

10   Q.   What information did you receive from Mr. Ruiz?

11           MS. ROSSI:  Objection, hearsay.

12           THE COURT:  Sustained.

13           MR. PENCE:  Your Honor, I'm not offering the

14   information for the truth of the matter; rather, the effect on

15   the listener to describe the process that the witness went

16   through in reviewing the data.

17           THE COURT:  It will still be sustained.

18           MR. PENCE:  Okay.  Thank you, Your Honor.

19   Q.   Did you perform any further analysis or conduct any

20   further analysis on the data that was extracted from the

21   phones?

22   A.   After the review, yes.

23   Q.   What further analysis did you do?

24   A.   Okay.  Okay.  When I presented the item for review, the

25   agent, pursuant to the warrant, told me what was suspected
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   child pornography.

2           MS. ROSSI:  Objection, hearsay.  Motion to strike.

3           THE COURT:  The question is, what did you do after you

4   got this information from him?  Did you do anything?

5           THE WITNESS:  I did.

6           THE COURT:  Okay.  What did you do?

7           THE WITNESS:  Oh, okay.  Well, what I did is based on

8   what I got back, so -- okay.  When I got the information back

9   from the agent, I tried to identify what part of the device

10  those items identified came from.

11          THE COURT:  Okay.

12          THE WITNESS:  And then I did a report of my findings.

13  BY MR. PENCE:

14  Q.   Does the report reflect a -- all the information on the

15  phone, or a narrower part of the information that was on the

16  phone?

17  A.   I'm not clear about your question.

18  Q.   Let me strike that question.  Move to strike that

19  question.

20       What was the purpose of the report that you prepared after

21  you received -- after you conducted your further analysis?

22  A.   The report is meant to discuss my findings after the

23  examination and review by the agent.

24  Q.   And generally speaking, what were your findings?

25  A.   That the two devices contained evidence alleged in the

1  search warrant, and -- I'm not sure.  I think that's pretty

2  much it.

3  Q.   And did you provide that report to Agent Ruiz after you

4  prepared it?

5  A.   Yes, I did.

6        MR. PENCE:  May I consult with counsel, Your Honor?

7        THE COURT:  Yes.

8     *(Government counsel confer privately.)*

9        MR. PENCE:  No further questions, Your Honor.

10       THE COURT:  Okay.  Cross?

11       MS. ROSSI:  No questions, Your Honor.

12       THE COURT:  Okay.  I'm going to take the liberty of

13  just asking a couple of questions.  I'm not too sure how

14  relevant it is.

15    You described the difference between a logical examination

16  and a direct examination.

17       THE WITNESS:  And a physical.

18       THE COURT:  And a physical examination.

19       THE WITNESS:  Yeah.

20       THE COURT:  A logical examination, you go to the phone

21  and you ask of the phone what's on it?

22       THE WITNESS:  Correct.

23       THE COURT:  How do you do a physical exam?  What's the

24  difference?

25       THE WITNESS:  Not to be too -- a physical, it's like a

1    dead body, essentially.  You can go physically pick through the

2    dead body and do whatever you want to do with it, as opposed to

3    a living human being where you say, "Where's your heart?"  I

4    can decide to tell you or not logically.  But a physical is you

5    have access to everything and you can take what's there without

6    asking for phone for it.

7         I'm not sure --

8              THE COURT:  Well, I'm not too sure it's that relevant

9    to the case, but I certainly don't understand.

10             THE WITNESS:  The key thing is, physical, you have

11   hundred percent of the information.  Logical, you get what you

12   get; it's not necessarily a hundred percent.

13             THE COURT:  Yeah, but you have to get to the phone to

14   get the information even on a physical examination.

15             THE WITNESS:  Correct.

16             THE COURT:  Well, I don't want to waste time on this.

17   It's probably not relevant.  It's just interesting information.

18        Any further questions of this witness, either side?

19             MS. ROSSI:  No, Your Honor.

20             MR. PENCE:  No, Your Honor.

21             THE COURT:  Okay.  You may step down.  Thank you very

22   much.

23             THE WITNESS:  Thank you, Your Honor.

24             MR. PENCE:  Your Honor, the government calls Special

25   Agent Jonathan Ruiz.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              THE CLERK:  Please --

2              THE COURT:  We can now identify you.

3         Go ahead.

4              THE CLERK:  Do you solemnly swear the testimony that

5    you are about to give in the matter now before the Court shall

6    be the truth, the whole truth, and nothing but the truth, so

7    help you God?

8              THE WITNESS:  I do.

9              THE CLERK:  Thank you.  You may be seated.

10        May I please ask that you state your full name for the

11   record and spell your last name.

12             THE WITNESS:  Name is Jonathan Ruiz.  First name is

13   spelled J-o-n-a-t-h-a-n.  Last, R-u-i-z.

14             THE CLERK:  Thank you.

15             THE COURT:  You may inquire, Counsel.
```

**JONATHAN RUIZ, GOVERNMENT'S WITNESS,**

**DIRECT EXAMINATION**

```
18   BY MR. PENCE:

19   Q.   Special Agent Ruiz, where do you work?

20   A.   I work for Department of Homeland Security, Immigration

21   and Customs Enforcement, Homeland Security Investigations in

22   our office in San Bernardino.

23   Q.   What is your job title?

24   A.   I'm a special agent.

25   Q.   How long have you been a special agent with ICE?
```

```
 1   A.   Since April of 2007.

 2   Q.   What is a special agent?

 3   A.   Special agent is a criminal investigator assigned to

 4   investigate crimes within -- within our jurisdiction or our

 5   statutes.

 6   Q.   What particular crimes do you investigate?

 7   A.   I'm assigned to a group that is assigned primarily child

 8   exploitation cases, terrorism cases and immigration compliance

 9   cases.

10   Q.   On or about October 13, 2015, did you obtain a search and

11   seizure warrant for 12959 Lasselle Street in Moreno Valley,

12   California?

13   A.   Yes, I did.

14   Q.   Why did you obtain that warrant?

15   A.   I had received information from an office, our office in

16   HSI Delaware, that identified a residence in our area of

17   responsibility that was suspected of distributing child

18   pornography and producing child pornography.

19   Q.   Did anyone assist you in the execution of that warrant?

20   A.   Yes.  Various individuals from our group in HSI Riverside.

21   Q.   If I refer to the address 12959 Lasselle Street as "the

22   residence," will you understand what I'm speaking of?

23   A.   Yes, I will.

24   Q.   What did the residence look like?

25   A.   Single-story residence, attached garage.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q.   Was there anyone present at the address other than law

 2    enforcement?

 3    A.   When the --

 4    Q.   At the time the search warrant was executed.

 5    A.   Yes.

 6    Q.   Who was present then?

 7    A.   The defendant, Angelo Harper, Jr., and his mother.

 8    Q.   Is Mr. Harper present in the courtroom?

 9    A.   Yes, he is.

10    Q.   Would you please identify a piece of clothing that

11    Mr. Harper is wearing.

12    A.   He's wearing the white jumpsuit.

13         THE COURT:  Indicating the defendant.

14    BY MR. PENCE:

15    Q.   Did you seize any electronic devices from the defendant's

16    residence?

17    A.   Yes, we did.

18    Q.   What devices did you seize?

19    A.   Seized computers, mobile phones, external storage media

20    devices.

21    Q.   And how did you know that defendant resided there?

22    A.   I had encountered him there, and he had identified that he

23    had a room at that residence.

24    Q.   What devices did you seize?

25    A.   We seized computers, mobile phones and digital devi- --
```

```
 1   thumb drives, external devices.

 2   Q.   Would you please take a look at Exhibits 15 and 16.  Do

 3   you recognize Exhibits 15 and 16?

 4   A.   I do.

 5   Q.   What are they?

 6   A.   They're mobile phones.

 7   Q.   Would you please also take a look at Exhibit 17.

 8           THE CLERK:  Physical?

 9        (Exhibit was handed to the witness by the clerk.)

10           THE WITNESS:  Thank you.

11   BY MR. PENCE:

12   Q.   Do you recognize Exhibit 17?

13   A.   I do.

14   Q.   How do you recognize Exhibits 15, 16 and 17?

15   A.   We seized them from the residence.

16           MR. PENCE:  Your Honor, the government moves to admit

17   Exhibit 17; Exhibits 15 and 16 having already been admitted.

18           THE COURT:  It will be received.

19           MR. PENCE:  Thank you, Your Honor.

20        (Received in evidence, Government's Exhibit 17.)

21   BY MR. PENCE:

22   Q.   At your ICE office, is there a procedure for examining the

23   content of electronic devices?

24   A.   Yes, there is.

25   Q.   What is that procedure?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  A.   When a device or evidence has been seized, if it's an

2  electronic device, we typically will provide that to our

3  computer forensics agent, who will acquire the data on those

4  devices and make it available for the case agent to review to

5  determine if there is evidence on the device within the scope

6  of the search warrant.

7  Q.   Was that procedure followed in this case?

8  A.   Yes, it was.

9  Q.   And was it followed with respect to Exhibits 15 through

10  17?

11  A.   Yes, it was.

12       THE COURT:  Let me just stop you for a second, because

13  I'm not too sure it's been identified.

14     Can you identify what 17 is?  You identify that you seized

15  it, but what exactly is it?

16       THE WITNESS:  17 is a mobile phone.

17       THE COURT:  Okay.

18  BY MR. PENCE:

19  Q.   What kind of a mobile phone is it?

20  A.   This -- 17 is the HTC Hero.

21       THE COURT:  Okay.

22       MR. PENCE:  Thank you.

23  Q.   As a result of this process, did you obtain forensic

24  copies of files found on defendant's iPhone and on the micro SD

25  card on his Evo Shift phone?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    A.    Yes, I did.

2    Q.    From whom did you obtain those forensic copies?

3    A.    Computer forensics Agent Salaam.

4    Q.    Would you please take a look at Exhibit 19.

5    A.    Yes.

6    Q.    You recognize Exhibit 19?

7    A.    Yes, I do.

8    Q.    How do you recognize Exhibit 19?

9    A.    I signed it.

10   Q.    And what does Exhibit 19 contain?

11   A.    It contains three images.

12         MR. PENCE:  Your Honor --

13         THE COURT:  Three images from where?

14         THE WITNESS:  These -- the three images that are on

15   this disc are three images that were recovered from the

16   defendant's iPhone.

17   BY MR. PENCE:

18   Q.    Are the images that are on that disc fair and accurate

19   representations of the images that were found on defendant's

20   iPhone?

21   A.    Yes, they are.

22         MS. ROSSI:  Objection, foundation.  Objection same as

23   in the motion in limine as to the images.

24         THE COURT:  Overruled.

25         MR. PENCE:  Your Honor, the government moves to admit
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Exhibit 19.

2            THE COURT:  It will be received.

3        (Received in evidence, Government's Exhibit 19.)

4    BY MR. PENCE:

5    Q.   Would you please just describe for us the images that are

6    in Exhibit 19.

7    A.   Child pornography involving infants, toddlers.

8    Q.   Would you please take a look at Exhibit 18.

9    A.   Yes.

10   Q.   Do you recognize Exhibit 18?

11   A.   Yes, I do.

12   Q.   What is Exhibit 18?

13   A.   These are -- these are the photos recovered from the

14   defendant's iPhone that I have redacted for the purpose of

15   creating this exhibit.

16   Q.   And do those images fairly and accurately reflect the

17   contents of the files found on defendant's iPhone?

18   A.   Yes, they do.

19           MR. PENCE:  Your Honor, the government moves to admit

20   Exhibit 18.

21           MS. ROSSI:  Same objection, Your Honor.

22           THE COURT:  It will be noted for the record.

23       Counsel, do we know what time these images were -- all you

24   know is these images were on the phone.  You have no idea when

25   they came on the phone, when they didn't?  Or is this stored

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    images?  I don't know what we're talking about here.

2          MR. PENCE:  Okay.

3    Q.   Would you please describe where --

4          THE COURT:  I know he got them off the phone.

5          MR. PENCE:  Sure.

6          THE COURT:  The question is, did he take them off a

7    database somewhere or did he take them off of a program

8    somewhere, an app somewhere?  Where did they come from?

9          MS. ROSSI:  Your Honor, objection, hearsay.  This

10   witness wasn't the one who extracted --

11         THE COURT:  Well, I'm just talking for identification.

12   I have no idea what we're talking about here.  I don't know

13   what time -- they may have been photographs from 2001, for all

14   I know.

15   BY MR. PENCE:

16   Q.   Agent Ruiz, where were these images found on defendant's

17   phone?

18         THE COURT:  Well, again, the objection is hearsay.

19         All you know is, these were given to you.  You don't know

20   where they came from or what they -- what time they were placed

21   on the phone or anything else; is that correct?  You know they

22   were on the phone.

23         THE WITNESS:  They're on the phone.  They are images

24   that I identified relevant to the investigation as being images

25   I recognized that were posted to the NEPILOVERS chat room.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1      THE COURT:  So you're saying you recognized these

2  images from what you saw before?

3      THE WITNESS:  That is why I bookmarked them.  Yes.

4      THE COURT:  Okay.  Overruled.

5  BY MR. PENCE:

6  Q.   Do you recognize Exhibits 20 and 22?

7  A.   Twenty-two... yes, I do.

8  Q.   Excuse me, Agent Ruiz, I think I may have -- I meant

9  Exhibits 20 and 21.  Do you recognize Exhibits 20 and 21?

10  A.   Yes, I do.

11  Q.   How do you recognize Exhibits 20 and 21?

12  A.   I signed these discs.

13  Q.   And what are Exhibits 20 and 21?

14  A.   They are -- both of them are compact discs.  Twenty --

15  twenty -- actually, 21 are two videos that I identified on the

16  HTC Evo Shift memory card, or the memory card within the HTC

17  Shift phone.  Exhibit 20 is a clip of one of the videos from

18  those two videos.

19      MR. PENCE:  Your Honor, the government moves to admit

20  Exhibits 20 and 21.

21      MS. ROSSI:  Your Honor, we would object to the

22  admission.  It's cumulative at this point.  And this is the

23  video again.  The Court already has the images in evidence.

24  It's 403.

25      THE COURT:  Is this the 403 exhibit that we saw

```
 1   earlier?
 2              MR. PENCE:  Your Honor, these are -- they are not.
 3   They are visually similar to the images that were already
 4   admitted, but they are being offered to show the connection
 5   between the phones and the images that you've already seen.
 6              THE COURT:  Yeah, it seems to me to be --
 7       Well, are these images you saw on the same date that we're
 8   talking about that you -- images that you saw when you looked
 9   at the phone and you said you saw advertising on the phone?
10   Were these images you saw on that date or you saw on a later
11   date?
12              THE WITNESS:  These two exhibits here refer to content
13   identified or recovered from the HTC Evo.  The other images
14   were from --
15              THE COURT:  Talking about the date.  We're talking
16   about an allegation that there was advertisement going on for
17   child pornography on a certain date, and the Court's interested
18   in whether or not -- what the photographs were surrounding that
19   date, et cetera, and surrounding that alleged advertising.  The
20   question is, were these from some other later date, or were
21   these from that time period?
22              THE WITNESS:  I would have to look at the posting on
23   the NEPILOVERS, but it is a video contained on that NEPILOVERS
24   link.
25              THE COURT:  It may not be during that date, Counsel.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          MR. STOUT:  Your Honor, may I have a --

2          THE COURT:  Yes.

3      *(Government counsel confer privately.)*

4          THE COURT:  Counsel, why don't we give you a chance to

5  talk about it, because we are going to take a break at this

6  time, but I am concerned about the fact that -- and we've

7  talked about it before.  What you need to prove this case is,

8  obviously, significant to the Court, but bringing in the whole

9  kitchen sink and what happened down the road and say, "Well, we

10  just want to bring this in to show" -- I guess another analogy

11  is, you can have a shooting in the Rose Bowl, and you can bring

12  in one witness who talks about the shooting, or you can bring

13  in 100,000 people, and the last, you know, 90,000 probably is

14  just cumulative.  And that's what the Court's problem with it

15  is, is that -- so anyway, think about it, and then we'll come

16  on back in as soon as we take the break.

17          MR. PENCE:  Thank you, Your Honor.

18          THE CLERK:  All rise.

19      *(Recess held from 10:27 a.m. to 10:44 a.m.)*

20          THE COURT:  Okay.  Counsel, you may continue.

21          MR. PENCE:  Yes, Your Honor.

22      Before I continue examining the witness, I would just like

23  to explain to the Court why it is that we're engaging in the

24  examination, because I understand the Court's concern about

25  cumulative evidence, especially in a child pornography case.

1          MS. ROSSI:  Your Honor, I would just object to counsel

2     testifying at this point.  I think that's for closing argument.

3          THE COURT:  Overruled.

4          MR. PENCE:  Your Honor, this evidence, or the

5     testimony that we anticipate eliciting, goes directly to the

6     issue of identity, which the defendant is challenging in this

7     case.  Specifically, the testimony that we anticipate will

8     establish that images that were posted on the Kik chat room in

9     August 26 -- or in August through October of 2015 are visually

10    similar to images that were found on the defendant's phone.

11    That evidence corroborates the identity of the person who posts

12    the advertisements in the Kik chat room.

13         In other words, in other words, Your Honor, the same

14    photographs that were found on defendant's phone were posted in

15    the Kik chat room.  And if identity is going to be disputed by

16    defendants, this evidence is probative of the person who in

17    fact posted the chats in the Kik chat room.

18         THE COURT:  The question is, is how many photographs

19    that were on his phone that are similar are you going to be

20    putting in?

21         MR. PENCE:  Yes, Your Honor.  We intend to put in one

22    clip from one video file that was found on defendant's phone,

23    as well as three redacted images that the -- three redacted

24    images of child pornography that were found on defendant's

25    iPhone.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  And that's it, just those four items?

 2              MR. PENCE:  Those are the items that we plan to put

 3    in.

 4              THE COURT:  Okay.

 5              MR. PENCE:  Yes.

 6              THE COURT:  Okay.

 7              MS. ROSSI:  And Your Honor, I can address it later if

 8    the Court wants, but the video, the Court doesn't need the

 9    actual video, because the Court has Mr. Harper's admission to

10    that count, Count 2.  That would be cumulative, it would be

11    extremely prejudicial, and it's not necessary for the Court to

12    view it.

13              THE COURT:  If it's not an issue, if you're not going

14    to contest that issue that they're going towards, then that's

15    fine, but he indicated that you were contesting identity.

16              MS. ROSSI:  Your Honor, we think that the other images

17    are sufficient to establish what the government is trying to

18    establish.  The three redacted images that the government is

19    seeking --

20              THE COURT:  Well, it may be, but I guess what I'm

21    saying is, I'm assuming it's still an issue, identity is still

22    an issue in this case.

23              MS. ROSSI:  No, Your Honor, I don't believe so.

24              MR. PENCE:  Is the defense stipulating that --

25         Excuse me.  Excuse me, Your Honor.  Just a moment.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1              THE COURT:  Okay.

2         *(Government counsel confer privately.)*

3              THE COURT:  And counsel, let me make a suggestion.  If

4    you want to take just 30 seconds and the two sides talk

5    together rather than this side talking and this side talking,

6    if there's some agreement, that's fine, let me know, and if

7    there's not, then I'll rule on it.

8              MR. PENCE:  I understand, Your Honor, and I appreciate

9    that.  I'm getting advice from my elders and betters and --

10             THE COURT:  Well, I don't mind that, but I'm thinking

11   maybe the two of you would like to talk.

12             MR. PENCE:  Well, the defense is not contesting

13   identity, and so we don't need -- the government does not

14   intend to put in its case in chief the video footage of child

15   pornography that was discussed earlier, but reserves its right

16   to put those clips in evidence in its rebuttal if something

17   happens on defendant --

18             THE COURT:  Okay.  Fine.

19   BY MR. PENCE:

20   Q.   Agent Ruiz, did you receive, from Oladele Salaam, data

21   from the HTC Evo Shift phone?

22   A.   Yes, I did.

23   Q.   Did you review that data?

24   A.   Yes, I did.

25   Q.   And did any -- what did you find in that data?

1          MS. ROSSI:  Objection, hearsay.

2          THE COURT:  Sustained.

3   BY MR. PENCE:

4   Q.   Agent Ruiz, would you please turn to Exhibit 18.

5   A.   Yes.

6   Q.   Do you recognize Exhibit 18?

7   A.   I do.

8   Q.   What is Exhibit 18?

9   A.   Exhibit 18 are printouts of images I have redacted,

10  recovered from the iPhone, the defendant's iPhone.

11  Q.   Are they fair and accurate representations of those

12  images -- of images found on the defendant's iPhone?

13  A.   Yes, they are.

14         MR. PENCE:  Your Honor, the government moves to admit

15  those images, Exhibit 18.

16         THE COURT:  Will be received.

17     (Received in evidence, Government's Exhibit 18.)

18  BY MR. PENCE:

19  Q.   Did you make any observations about those images that you

20  found on defendant's iPhone?

21  A.   Yes, I did.

22  Q.   What observation did you make?

23  A.   These -- specifically these three images were the same

24  images that were posted to the NEPILOVERS chat room as captured

25  by SA McCall.  Special Agent McCall.  Sorry.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q.   Were they absolutely identical to the images that were
 2   found on the S -- strike that.  Excuse me.
 3        I withdraw the question, Your Honor.
 4        At the search warrant, at the execution of the search
 5   warrant, did you interview the defendant?
 6   A.   Yes, I did.
 7   Q.   How long did that interview last?
 8   A.   Approximately two hours.
 9   Q.   Where did that interview take place?
10   A.   At his residence.
11   Q.   Who was present during the interview?
12   A.   Myself, Riverside County district attorney investigator
13   Heidi Chebahtah, and the defendant.
14   Q.   Did you make a recording of that interview?
15   A.   Yes, I did.
16   Q.   How was that recording made?
17   A.   With a digital voice recorder.
18   Q.   Had you used similar digital voice recorders in the past?
19   A.   Yes.  Numerous times.
20   Q.   And was the device used that day in normal operating
21   condition?
22   A.   Yes, it was.
23   Q.   Was the device capable of accurately reproducing sounds?
24   A.   Yes, it was.
25   Q.   Do you recognize Exhibits 25A through Z?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.    Exhibit 25 is a compact disc that I've signed.

2    Q.    What does Exhibit 25 contain?

3    A.    This is a disc containing portions of the recorded

4    interview that took place on October 13, 2015.

5    Q.    How do you know that to be true?

6    A.    I've reviewed the contents of this disc, and I signed it

7    after I reviewed those contents.

8    Q.    Do those clips fairly and accurately reflect the

9    defendant's statements during that interview?

10   A.    Yes, they do.

11        MR. PENCE:  Your Honor, the government moves to admit

12   Exhibits 25A through Z.

13        MS. ROSSI:  Your Honor, we just have objections to

14   some of the contents of the clips, including there's

15   approximately, I believe, 50 minutes of Mr. Harper discussing

16   the unrelated pending matter in the Riverside Superior Court,

17   which the government has moved to admit under Federal Rules of

18   Evidence 414 and we've objected to.  It's the subject of a

19   motion in limine.  It's extremely lengthy, and I don't think

20   the Court needs to hear all of that.

21        MR. PENCE:  Your Honor, the defendant made almost two

22   hours' worth of statements and admissions during his interview.

23   The government has selected clips that substantially cut down

24   the length of time that would need to be played in court, and

25   intends to play only a fraction of that entire interview.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                    THE COURT:  Well --

 2                    MR. PENCE:  And in addition, Your Honor, I believe

 3     that the --

 4                    THE COURT:  You're introducing the entire transcript

 5     here.

 6                    MR. PENCE:  Your Honor, I believe Agent Ruiz just

 7     identified an exhibit that contains just clips from the

 8     interview that occurred.

 9                    THE COURT:  Is that true?  It's not the whole

10     interview?

11                    THE WITNESS:  Correct, this CD's just clips from that

12     interview.

13                    THE COURT:  And Counsel, have you had a chance to

14     listen to those clips?

15                    MS. ROSSI:  I have not, but government counsel did

16     provide the portions of the transcript that it intends to

17     introduce, and so our concern is that, added up, about 50

18     minutes of it specifically relates to --

19                    THE COURT:  You're objecting to parts of it that deal

20     with discussions that dealt with the state court matters; is

21     that correct?

22                    MS. ROSSI:  Correct.  Yes, Your Honor.

23                    THE COURT:  Okay.  And that was the subject of a

24     motion in limine.

25                    MS. ROSSI:  It was, Your Honor.
```

```
 1              THE COURT:  Okay.

 2              MR. PENCE:  Your Honor -- sorry.

 3              THE COURT:  And you're saying that you want to admit

 4    that under 414?

 5              MR. PENCE:  Rule 414, Your Honor, which specifically

 6    provides that prior -- or acts of molestation are admissible.

 7              THE COURT:  Read the first sentence of 414 if you have

 8    it there.

 9              MR. PENCE:  Yes, Your Honor, I've read it.

10              THE COURT:  Can you read it out loud?

11              MR. PENCE:  Certainly, Your Honor.

12                 "In a criminal case in which a defendant is

13                 accused of child molestation, the Court may admit

14                 evidence that the defendant committed any other

15                 act of child molestation."

16              THE COURT:  Okay.  I'm going to sustain the objection

17    as to that portion.  I'm not too sure this qualifies under that

18    section, the meaning of that section as child molest- -- as he

19    being charged in this case with child molestation.

20              MS. PALMER:  Your Honor, may I --

21              THE COURT:  I know the argument on it, Counsel.  The

22    Court's going to sustain the objection as to conversations

23    concerning the other child molestations.

24              MR. PENCE:  Your Honor, we'll proceed and -- cognizant

25    of the Court's ruling.
```

```
 1              THE COURT:  Yeah, the rest of it will be admitted.

 2              MR. PENCE:  Okay.

 3              THE COURT:  And I don't know if you -- are you going

 4    to be playing that, or are you going to have him testify to

 5    that, or what are you going to do?

 6              MR. PENCE:  To the recorded conversation?

 7              THE COURT:  Yeah.

 8              MR. PENCE:  We are going to play the recording and

 9    provide -- yes, Your Honor.

10        Your Honor, I'm asking my colleague to play a clip which

11    is Exhibit 25B, which is found in the -- among the admitted

12    clips.

13              THE COURT:  Okay.

14              MR. PENCE:  And that clip is from 6 minutes and 50

15    seconds to 12 minutes and 1 second --

16              THE COURT:  Okay.

17              MR. PENCE:  -- in the defendant's recorded interview.

18        Oh, and Your Honor, if you would like to follow along, the

19    matching transcript is shown in 25B of the government's exhibit

20    binder.  32B.

21        (Audio played.)

22              MR. PENCE:  Your Honor, the government now would play

23    Exhibit 25C, which is found in the recording at minutes 12:20,

24    12 minutes and 20 seconds, through 13 minutes.

25              THE COURT:  Okay.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              MR. PENCE:  And which is in Your Honor's exhibit

2    binder at 32C.

3              THE COURT:  Got it.

4         (Audio played.)

5    BY MR. PENCE:

6    Q.   Agent Ruiz, do you recognize the voices that you hear in

7    Exhibits 25B and 25C that were just played?

8    A.   Yes, I do.

9    Q.   Whose voices are those?

10   A.   It's myself and the defendant, Angelo Harper, Jr.

11             MR. PENCE:  The government will now play clip 25E,

12   which is from 18 minutes and 20 seconds in the recorded

13   interview through 21 minutes and 2 seconds in the recorded

14   interview.

15             THE COURT:  Okay.

16        (Audio played.)

17   BY MR. PENCE:

18   Q.   Agent Ruiz, did you recognize the voices in the clip that

19   you just heard?

20   A.   Yes, I did.

21   Q.   Whose voices were in that clip?

22   A.   Myself, investigator Heidi Chebahtah, and the defendant,

23   Angelo Harper, Jr.

24             MR. PENCE:  The government's now going to play clip

25   25E, which is a clip from the same interview, between minutes
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    21 and 34 seconds to 22 minutes and 13 seconds.

2         *(Audio played.)*

3    BY MR. PENCE:

4    Q.   Agent Ruiz, would you please look at Exhibit 22.

5    A.   Yes.

6    Q.   You recognize Exhibit 22?

7    A.   I do.

8    Q.   How do you recognize Exhibit 22?

9    A.   These are copies of the printouts I showed the defendant

10   during our interview on October 13, 2015.

11        MR. PENCE:  Your Honor, the government moves to admit

12   Exhibit 22.

13        THE COURT:  Be received.

14        *(Received in evidence, Government's Exhibit 22.)*

15   BY MR. PENCE:

16   Q.   What, if anything, did the defendant tell you about

17   Exhibit 22 when you showed him on the day -- when you showed it

18   to him on the day you interviewed him?

19   A.   The -- that he recognized the documents, the first being

20   this screen capture here of the user profile Bobby Green and

21   the profile for the group NEPILOVERS on Kik.

22   Q.   Did you discuss anything else about Exhibit 22 with

23   defendant?

24   A.   The subsequent photograph which I showed him was a

25   redacted version of a phone -- I'm sorry, was a version, a

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    redacted version of what SA McCall downloaded from the

2    NEPILOVERS chat room.  I showed him this photograph, and he

3    identified it.  He recognized it as one he had posted to the

4    group.

5    Q.   Did you and the defendant have any further discussion

6    about the redacted photograph that's in Exhibit 22?

7    A.   Yes, we did.

8    Q.   What additional discussion did you have about that

9    photograph?

10   A.   The defendant explained -- when I showed him the image

11   here, he had explained that other members of the group had been

12   misleaded by the photo.

13   Q.   Did he explain to you how it was that he believed that

14   they had been misled?

15   A.   The image -- the image appears on Kik as though it had

16   been taken live on the defendant's device that he was using to

17   communicate on Kik.

18   Q.   Stepping away from the photo for a second, did the

19   defendant explain to you how he used his electronic devices to

20   post on Kik?

21   A.   Yes, he did.

22   Q.   With reference to Exhibits 15 and 16, could you

23   demonstrate for us how he explained he posted devices on Kik?

24   A.   Posted images or --

25   Q.   Posted images, excuse me.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    A.   Exhibit 15 is the defendant's iPhone that was recovered

2    from his person.  The defendant explained to me that he would

3    recover or -- or obtain images of child pornography using the

4    iPhone image, whether it be TOR or his application, Kik.  He

5    would present that image on his iPhone, and then using what is

6    Exhibit 16, the HTC Evo that is logged into the Kik

7    application, would take a photograph of the iPhone screen so

8    that it is transmitted to the Kik chat room.

9    Q.   You mentioned TOR.  What is TOR?

10   A.   TOR is short for The Onion Router.  It is a browsing -- a

11   browser that he had explained to me he uses to obtain child

12   pornography.

13   Q.   Did you discuss with defendant other sources from which he

14   obtained child pornography to post online?

15   A.   Yes, I did.

16   Q.   What other sources did he identify to you?

17   A.   In addition to TOR and in addition to Kik, he had

18   identified a long time ago having used Google Images, having

19   received child pornography images on platforms like Yahoo

20   Messenger, as well as a service called -- an electronic service

21   called pCloud, which is an electronic service that provides a

22   user the ability to store files online and also make those

23   files available to other users through hyperlinks or password

24   access.  And Zip.  Another one, Zip, was another application

25   that he had used to retrieve child pornography files that would

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   be -- that he told me would be found on his iPhone.

2   Q.   Have you reviewed screen shots of the images that

3   defendant posted on the Kik user group, chat room, NEPILOVERS?

4   A.   I have reviewed the screen captures SA McCall obtained on

5   NEPILOVERS, yes.

6   Q.   Did you observe any reference or mention of the pCloud

7   service on those screen captures?

8   A.   Yes, I did.

9   Q.   What reference or mention did you on see on those screen

10  captures?

11  A.   In one of the postings made by the Bobby Green account to

12  the NEPILOVERS chat roon is a hyperlink for a video file which

13  portions of were found on the HTC Evo memory card.  But the

14  posting itself contained the hyperlink referencing pCloud and

15  the ability to obtain the file using that hyperlink.

16  Q.   What is a hyperlink?

17  A.   Hyperlink provides a user the ability to touch like you

18  would on a cursor on a computer screen.  You would click it.

19  And in the case of a phone or a mobile device, you would use

20  your finger, and it would make available the content depicted

21  on the screen.  It would link you to the source of that

22  information.

23            MR. PENCE:  The government is now going to play clip

24  25-O.

25            THE COURT:  25 --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          MR. PENCE:  O.  Which is from 1 hour and 1 minute and

2   46 seconds to 1 hour and 11 minutes and 33 seconds in the

3   recorded interview of defendant on October 13, 2015.

4          THE COURT:  Okay.

5      *(Audio played.)*

6   BY MR. PENCE:

7   Q.   Agent Ruiz, do you recognize the voices that you heard in

8   the clips that were just played?

9   A.   Yes, I do.

10  Q.   Whose voices were those?

11  A.   Mine and the defendant, Angelo Harper, Jr.

12         MR. PENCE:  The government will now play clip 25Q,

13  which is a clip from 1 hour, 20 minutes and 43 seconds to 1

14  hour, 20 minutes and 58 seconds.

15     *(Audio played.)*

16  BY MR. PENCE:

17  Q.   Whose voices were in that clip, Agent Ruiz?

18  A.    Myself and again the defendant, Angelo Harper, Jr.

19         MR. PENCE:  And the government will now play clip 25R,

20  which is from 1 hour, 22 minutes and -- clip 25R, which is

21  between 1 hour, 22 minutes and 10 seconds, and 1 hour, 22

22  minutes and 30 seconds.

23     *(Audio played.)*

24  BY MR. PENCE:

25  Q.   Agent Ruiz, I'd like to turn your attention to the HTC

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    Shift phone.  Did you review data extracted from the HTC Shift
2    phone?
3    A.    Yes, I did.
4    Q.    Did you make any observations about the data that you
5    extracted from that phone?
6    A.    Yes, I did.
7    Q.    What observations did you make?
8    A.    The phone, the memory card within the phone in which the
9    data was extracted, there were two videos.  There were portions
10   of a video that were the same video downloaded by SA McCall
11   from the NEPILOVERS chat room that was posted by the defendant.
12   Q.    How do you know that they were portions of the same video
13   that had been extracted from Agent McCall?
14   A.    I reviewed Agent McCall's screen captures.  I've also
15   reviewed the video downloaded by Agent McCall, the full
16   six-minute video, and compared those to what was found on the
17   HTC Evo memory card.
18   Q.    Were those videos, did they depict the same thing?
19   A.    They're -- yes.  They are visually similar.  They contain
20   a segment of the video that was downloaded by Agent McCall of
21   the whole video.
22   Q.    Would you please describe the segment that you viewed.
23   A.    The -- the segment that I viewed on the HTC memory card?
24   Q.    That's correct.
25   A.    They depict a young boy, under the age of three years old,
```

```
 1    being sexually assaulted by a male adult.  During the video

 2    there are some advertisements or banners acknowledging the

 3    boy's age.  I believe it -- boy ram --

 4              MS. ROSSI:  Objection, hearsay.

 5              THE COURT:  Overruled.

 6              THE WITNESS:  Two years old --

 7              THE COURT:  This is what you saw; is that correct?

 8              THE WITNESS:  Yes, this is in the video itself.  The

 9    video is segmented into sort of portions where there's the

10    visual depiction of a minor being sexually assaulted, and then

11    it will stop and display a banner page, I think -- I think

12    something to the effect of "the boy eats cum," and then it will

13    play another portion in which the boy's sexually assaulted

14    where a male adult is forcing his penis into the boy's mouth.

15    BY MR. PENCE:

16    Q.   Okay.  Let's be clear.  The video, the portion of the

17    video that you just described, that was six minutes in length?

18    A.   Yes.

19    Q.   Where was that video found?

20    A.   That is the video that was downloaded by Agent McCall from

21    the NEPILOVERS room as posted by the Bobby Green account.

22    Q.   And how do you know that?

23    A.   I have reviewed it and I've watched it.

24    Q.   Okay.  And you watched other videos found on the

25    defendant's HTC Evo Shift memory card?
```

```
 1   A.   Correct.

 2   Q.   And how long were those videos?

 3   A.   Those portions were very short, like a minute each, I

 4   believe.

 5   Q.   And you compared those portions to what you saw in Agent

 6   McCall's -- you compared those portions to what you saw that

 7   Agent McCall had downloaded?

 8   A.   Yes.  I -- as I was going through the content on the HTC,

 9   I found those videos and recalled them from being what was

10   downloaded from -- by McCall.

11            MR. PENCE:  Just one moment, Your Honor.

12        Your Honor, the government will now play Exhibit 25V.

13            THE COURT:  D as in David?

14            MR. PENCE:  V as in Victor, Your Honor.

15            THE COURT:  V as in Victor, okay.

16            MR. PENCE:  Which runs from 1 hour, 39 minutes and 26

17   seconds of the full recorded transcript, or from the full

18   recording, to 1 hour and 39 minutes and 36 seconds of that

19   recording.

20            THE COURT:  Okay.

21        (Audio played.)

22            MR. PENCE:  The government will now play clip 25Y from

23   the full recording of defendant's recorded interview, and that

24   clip is from 1 hour, 49 minutes and 37 seconds to 1 hour, 52

25   minutes and 1 second.
```

```
 1              THE COURT:  Okay.

 2        (Audio played.)

 3   BY MR. PENCE:

 4   Q.   When you interviewed the defendant on October 13th, did

 5   you suspect that he had produced child pornography?

 6   A.   Yes.  Yes, we did.

 7   Q.   Why did you suspect that he had produced child

 8   pornography?

 9   A.   The Kik application identifies the source of the file

10   that's being uploaded to the service provider, and in some of

11   the pictures that the Bobby Green account posted to the

12   NEPILOVERS chat room contained a tag on the photo that said

13   "camera."

14        Unlike an image that somebody uploads to Kik from, say,

15   their gallery or a pre-existing photo that's on their device,

16   if an individual or a Kik user wants to use one of those images

17   and post it to the gallery -- I'm sorry, post it to the Kik

18   chat room, it will have a gallery tag on the image that is

19   transmitted to the group.

20        When this case first initiated, the images that were of

21   concern to myself and Agent McCall were the ones that

22   specifically had the photo icon -- I'm sorry, camera icon on

23   the image in the room.  We believe that he had had access to a

24   child and was taking photos of the molestation.

25   Q.   And during the interview, did you ask the defendant about
```

1   these concerns that you had that he had produced child

2   pornography?

3   A.   Yes, I did.

4   Q.   How did you understand him to -- what did -- what was his

5   response?

6   A.   Well, I believe I'd hinted earlier, or not hinted, but

7   stated earlier that he had discussed or told me that other

8   members of the group were misleaded by the photos as well,

9   because they do have a camera tag on the image, and that they

10   weren't, in fact, children that were in the house that were

11   being sexually assaulted; they were pictures of existing images

12   he had recovered from the Internet displayed on his iPhone and

13   then took a picture using another device, in this case

14   Exhibit 16, in transmitting those to the Kik chat room.

15   Q.   Did you try to confirm the story that defendant told you

16   about how he had posted the images that you thought might have

17   been produced child pornography?

18   A.   Yes, I did.

19   Q.   What did you do to confirm -- what did you do to try to

20   confirm the defendant's story?

21   A.   I looked back at the images that were uploaded to Kik, the

22   screen capture specifically that SA McCall or Agent McCall

23   caught or obtained, and in those images, some of the pictures

24   that were -- or images that were uploaded to Kik, you can see a

25   border.  The image is sort of askew, and you see what would not

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   be depicted if an individual was just taking a picture using a
 2   camera, and there would be no frame.  The image actually was
 3   cut on the side.  I looked at it further, and it appears to be
 4   the edge of an iPhone that is displayed on the image that was
 5   posted to the Kik NEPILOVERS room.
 6              MR. PENCE:  Your Honor, the government has no further
 7   questions.
 8              THE COURT:  Okay.  Counsel, on cross -- and let me
 9   help you out.  We're going to have to break in about five or
10   ten minutes.  Would you rather just come back at 1:30 and start
11   your cross then?
12              MS. ROSSI:  Your Honor, I don't have any questions.
13              THE COURT:  That's no fair, Counsel.
14        Okay, you may step down.
15              THE WITNESS:  Thank you, Your Honor.
16              THE COURT:  Then let me go over to the prosecution.
17        Would you care to call your next witness now,
18   understanding you've got about five or ten minutes, or would
19   you rather start it at 1:30?
20              MR. STOUT:  May we have a moment, Your Honor?
21              THE COURT:  Sure.
22        (Government counsel confer privately.)
23              MS. PALMER:  Your Honor, we prefer to take the lunch
24   break if we can.
25              THE COURT:  Okay.  We'll break now, come back at 1:30.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          Probably have to break about 2:30, quarter of 3:00, so

2     it's only about an hour or hour and a few minutes we have this

3     afternoon, and then we should have all day tomorrow on it,

4     okay?

5          MS. PALMER:  Thank you, Your Honor.

6          MR. STOUT:  Thank you.

7          Your Honor, if I could, in the event that -- the last

8     witness is the one that is subject to the objection, so in the

9     event that that witness does not -- is not called today, would

10    the Court proceed to closing argument this afternoon, or would

11    the Court -- if there were no more witnesses in the

12    government's case in chief, and obviously depending on what the

13    defense does on their case in chief --

14         THE COURT:  Counsel, I mentioned before the advantage

15    of -- and I know maybe I'm preaching to the choir, the

16    advantage of two sides talking together, because many times you

17    can streamline it for both sides and make it easier for both

18    sides.  You can get much more done if you talk together.  If

19    the two sides came together on this and said we really would

20    like to wait till tomorrow morning, I normally will do anything

21    that both sides agree on.  Otherwise, I'll make the call.

22         MR. PENCE:  Thank you, Your Honor.

23         MS. ROSSI:  Thank you, Your Honor.

24         THE COURT:  So I guess what I'm saying is, talk to

25    each other.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                    THE CLERK:  All rise.

 2          Court is in recess.

 3          (Lunch recess held from 11:37 a.m. to 1:54 p.m.)

 4                    THE COURT:  Okay.  Counsel, you want to call your next

 5   witness, please.

 6                    MR. PENCE:  Your Honor, the government has a few

 7   housekeeping matters to address with the Court.

 8                    THE COURT:  Okay.

 9                    MR. PENCE:  To start, Your Honor, the government would

10   move in the transcript of defendant's guilty plea, which is

11   Exhibit 31.

12                    THE COURT:  Okay.

13                    MR. PENCE:  The government's moving that that exhibit

14   be admitted into evidence.

15                    THE COURT:  It has.  What exhibit number?

16          MR. PENCE:  31.

17                    THE COURT:  Oh, 31?  Okay.

18          MR. PENCE:  Yes.

19                    THE COURT:  Okay, it will be received.

20                    MR. PENCE:  In addition, Your Honor, the parties have

21   reached a stipulation.  The parties -- which I'd like to read

22   into the record.

23                    THE COURT:  Okay.

24                    MR. PENCE:  "The parties stipulate that the images in

25   Government's Exhibit 12 and at page 1 of Government's Exhibit
```

```
 1    18 depict actual minors."

 2              THE COURT:  So stipulated, Counsel?

 3              MS. ROSSI:  So stipulated, Your Honor.

 4              MR. PENCE:  In addition, Your Honor, we would like to

 5    make it clear on the record that the defendant himself

 6    stipulates.

 7              THE COURT:  Okay.  Well, she stipulated, and that's

 8    all that we need at this time.  Okay.

 9              MR. PENCE:  Yes, Your Honor.

10              THE COURT:  Okay.

11              MR. PENCE:  Your Honor, the government rests.

12              THE COURT:  Okay.

13         Defense?

14              MS. ROSSI:  Your Honor, the defense rests.

15              THE COURT:  Okay.  Counsel, you wish to be heard now?

16    I did give you that option of tomorrow.  I thought it was going

17    to go longer.

18              MS. ROSSI:  Your Honor, we'd request to come back

19    tomorrow.

20              MR. PENCE:  That works for the government as well,

21    Your Honor.

22              THE COURT:  Sounds good to me.

23         9:00 o'clock tomorrow morning?

24              MR. PENCE:  We'll be there.

25              MS. ROSSI:  That works for the defense.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  We'll see you back then.

 2              MR. PENCE:  Thank you, Your Honor.

 3              MS. ROSSI:  Thank you, Your Honor.

 4              THE CLERK:  All rise.

 5         Court is adjourned.

 6

 7              (Proceedings adjourned at 1:56 p.m.)

 8

 9                          --o0o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                         CERTIFICATE

 2

 3       I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported proceedings

 6   held in the above-entitled matter and that the transcript page

 7   format is in conformance with the regulations of the

 8   Judicial Conference of the United States.

 9

10   Date:  January 24, 2017

11

12

13

14                        /S/ SANDRA MACNEIL
                         _____

15                   Sandra MacNeil, CSR No. 9013

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA